**METALIMPORT OF ROMANIA, Plaintiff,**

v.

**S. S. ITALIA, her engines, boilers, etc.**

**and**

**Hellenic Lines, Ltd., Defendant.**

**No. 74 Civ. 3018.**

United States District Court, S. D. New York.

Nov. 18, 1976.

Bigham Englar Jones & Houston, New York City, for plaintiff; Alexander Peltz, William R. Connor, III, New York City, of counsel.

Burlingham Underwood & Lord, New York City, for defendant; Nicholas H. Cobbs, Alexander S. Kritzalis, John S. Rogers, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is an admiralty cargo action, tried to the Court, involving 268 coils of electrical steel sheets being transported from Baltimore, Maryland to Constanza, Romania aboard defendant's vessel, the S.S. ITALIA ("ITALIA") in January and February of 1971. The coils were loaded on board the ITALIA on or about January 8, 1971 at Baltimore, Maryland, and defendant issued a clean bill of lading No. 1 (Exhibit 1). The cargo was outturned in Constanza, Romania between February 25, 1971 and March 1, 1971. Following the discharge, the coils were transported by rail or truck, or both, to Craiova, Romania, where they were surveyed by plaintiff's underwriter almost three months later on or about June 21, 1971. See Exhibit 10.

Of the 268 coils which arrived in Craiova, the surveyor, Mr. William Howard, examined 45 which the consignee, Metalimport, claimed to have been damaged. Mr. Howard found that 23 had been damaged, 4 so completely as to have no commercial value, and 19 which were damaged by water penetration believed to be " . . . a result of contact with water of a fresh nature.

Probably rain during transit, and most probably while the goods were in the care of the vessel." *Transcript* of Trial dated June 8, 1976 at page 139.[1]

Following this survey, the London underwriters, Legal and General Assurance Society, Ltd., paid the consignees the sum of $9,785.88. The underwriters were then subrogated to the claim of the consignees as to any claims "for rust damage, etc. amounting to U.S. $9,785.88" by instrument dated August 10, 1971. See Exhibit 8.

At the trial, plaintiff called J. F. McArdle, the Senior Claims Supervisor for U.S. Steel International, who identified the Bill of Lading No. 1 issued by the defendant on January 8, 1971, and the commercial invoice issued by U.S. Steel International to Bishopsgate Steel, a customer of U.S. Steel International in England. See Exhibit 2. Mr. McArdle also identified the packing list and other documents regarding the testing of the coils (Exhibit 5), and testified as to the nature of the packing of the coils. See Exhibit 6. On February 9, 1971, U.S. Steel International filed a tentative claim with the Hellenic Lines covering damage to the cargo while it was on the pier and being loaded aboard the ITALIA in Baltimore. See Exhibit 7.

Richard M. Randall then testified for the plaintiff that he was the correspondent for the London Insurance Company which made a claim against the Hellenic Lines as subrogee of the consignees in the amount of $9,785.88.

William Raccioppi, the marine surveyor for U.S. Steel International, testified for the plaintiff as to the survey he made of the coils on the pier being loaded on the ITALIA in Baltimore. He testified as to some minor damage at loading which he observed and reported to his company, and described the cargo, when loaded, as in generally good condition. See Exhibit 7.

William H. Howard, the surveyor with Robert Lyon & Co. of London, England,

1. The survey conducted by Mr. Howard was requested by the underwriters, Legal and General Assurance Society, Ltd. Following the survey, the underwriters paid Metalimport

$9,785.88 and were subrogated to the claims of Metalimport by instrument dated August 10, 1971.

testified about the survey he made in Craiova, Romania almost three months after the cargo had been discharged at Constanza. *See* Exhibit 10.

Edward Polese, the Assistant Manager of the Mediterranean Division for the Hellenic Lines, testified for the defendant as to the tariffs in effect for the carriage of goods to Constanza, promulgated by the North Atlantic-Mediterranean Freight Conference, indicating that the rate charged was on the basis of "free out", and that for the purposes of the tariff the carrier did not pay for the unloading at Constanza. *See* Exhibit "D". Polese explained that in Romania everything is controlled by Navlomar, a division of the Ministry of Transport, and "the reason cargoes move on a free-out basis is because the carrier has no choice in stevedoring or agencies. Everything is government controlled." *Transcript* of Trial dated June 9, 1976 at page 193.

Defendant also submitted the deposition testimony of the master of the ITALIA, Panagiotis Tsimtsilis, taken December 29, 1975, who testified as to the unloading of the steel coils in Constanza.

### Damage in Baltimore

The surveyor for U.S. Steel International, Mr. Raccioppi, testified that he observed some damage to the cargo while it was being loaded on the ITALIA, but he did not indicate that the damage was severe, suggesting to the stevedores and Hellenic Lines that some bands on the coils be replaced and that some of the wrapping be patched. *Transcript* dated June 8, 1976 at page 64. There is nothing in this testimony to indicate serious damage to the cargo or any reason why Hellenic Lines should not have issued Bill of Lading No. 1. Nor is there any evidence that the cargo sustained damage in transit from Baltimore to Constanza. It is true that other cargo was loaded on top of the steel coils in some of the ship's holds, but there is nothing unusual about this, or any indication that this was the cause of any of the damage found following the vessel's arrival. *See* Deposition of Pan-

agiotis Tsimtsilis dated December 29, 1975 at pp. 17–18 (hereinafter Exhibit 18).

### Unloading in Constanza

The record does indicate that the unloading operation in Constanza was a sloppy job. No forklifts were used and it was observed that some of the coils were dropped and tipped over in the holds before being unloaded onto the pier. Exhibit 18 at pp. 24–26. Moreover, the Captain testified that it had snowed in Constanza before the ITALIA arrived and that it was raining a good part of the time during the course of the unloading, and that the coils were unloaded onto the pier and into uncovered railroad cars. Exhibit 18 at pp. 23–24.

The unloading operation in Constanza, and not the loading in Baltimore, appears to be the cause of the damage to the coils found by Mr. Howard in Craiova several months later. His finding that 4 of the coils were irreparably damaged by having been crushed, and that 19 suffered fresh water damage is consistent with the deposition testimony of Captain Tsimtsilis. Moreover, there is nothing in the record to show whether and how often these coils were exposed to the rain after they left Constanza and before they were examined in Craiova.

### Issues Presented

Under the general law of maritime carriage, a public carrier of goods by sea is absolutely responsible for the safe delivery of the cargo, unless damage or loss was caused by an Act of God, public enemy, or the inherent vice of the goods or fault of the shipper and the carrier was not negligent or otherwise at fault. *See* Gilmore & Black, *The Law of Admiralty* 139–140 (2d ed. 1975). This general law has been modified by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* which applies to contracts for the carriage of goods by sea to or from ports of the United States, in foreign trade. The Act defines the rights and duties of the parties "from the time when the goods are loaded on to the time when they are discharged from the ship." Gil-

more & Black, *supra* at 147, *citing* 46 U.S.C. § 1301(e).

Here, plaintiff has introduced evidence of a clean bill of lading issued by the defendant in Baltimore (Exhibit 1) and therefore contends that the burden of proof has shifted to the defendant to explain the failure to deliver the cargo in good condition. *See Schnell v. The Vallescura,* 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *Schroeder Bros., Inc. v. The Saturnia,* 226 F.2d 147 (2d Cir. 1955); *Caterpillar Overseas, S.A. v. S.S. Expeditor,* 318 F.2d 720 (2d Cir. 1963); Gilmore & Black, *supra* at 184–185.

Section 1304(2)(q) of Title 46 of the United States Code provides, in part:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on. the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

Here, the Captain testified that during the unloading at Constanza he made two protests to Navlomar, the Romanian Government agency. The first protest concerned the manner in which the coils were unloaded from the ITALIA to which he received the reply, "Captain, this is the way to discharging. Okay?" Exhibit 18 at page 30. A second protest was made regarding the rain and snow and the possible wetting of the coils, which also went unheeded. Exhibit 18 at pp. 30–31.

While it is true that the defendant had notified the stevedores in Baltimore of damage to 19 coils (Exhibit 18 at pp. 42–46), there is no identity between those 19 coils and the coils that were later found to be. damaged in Craiova. The notice in Baltimore was merely to protect the record, and the fact that the damage was not severe is borne out by the issuance of the clean bill of lading. Exhibit 1. Since the damage in question is minor compared to the value of the cargo as a whole (23 coils out of 268 coils), there is no basis for claiming that Hellenic Lines defrauded the plaintiff by the issuance of a clean bill of lading in Baltimore.

To come within the liability exception under 46 U.S.C. § 1304(2)(q), Hellenic Lines must show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage. The record satisfies the Court that the damage was not due to the actual fault or privity of the carrier. The more difficult question is whether the damage was due to the fault or neglect of the agents or servants of the carrier.

Here there is no doubt that some of the damage found in Craiova was due to the sloppy unloading by the stevedores in Constanza. The stevedores did not use forklifts to unload the steel coils; they dropped some of the coils while removing them from the ship's holds; and they placed the steel coils in open railroad cars or left them uncovered on the pier. The record does not indicate how long the coils were left at Constanza before being shipped to Craiova. However, the record does indicate that the stevedores were controlled by the Romanian Government and that every ship coming into Constanza had to use them whether they wished to or not. *Transcript* of Trial dated June 9, 1976 at 193, 198. It also appears that Hellenic Lines had no control over the manner in which the stevedores unloaded the cargo. Exhibit 18 at pp. 29–31. Consequently, in this case it does not appear that the stevedores were agents of the Hellenic Lines and that their actions can be imputed to the defendant.

Accordingly, the Court finds that the defendant has proven by a fair preponderance of the evidence that it is not responsible for the damage or loss of the coils under the exception provision of 46 U.S.C. § 1304(2)(q).

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

774

Judgment may be entered for the defendant.