METALIMPORT OF ROMANIA,
Plaintiff,

v.

S. S. TURKIA, her engines, boilers,
etc., Defendant.

METALIMPORT OF ROMANIA

v.

HELLENIC LINES LTD., Defendant.

No. 74 Civ. 3017 (CHT).

United States District Court,
S. D. New York.

Dec. 15, 1977.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; Alexander Peltz, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants; John S. Rogers, Nicholas H. Cobbs, William J. Blumenschein, New York City, of counsel.

## OPINION

TENNEY, District Judge.

 This is an admiralty cargo action, tried to the Court, involving 264 coils of cold rolled electrical nonoriented steel sheet carried from Baltimore to Constanza, Romania aboard defendant Hellenic Lines Limited's ("Hellenic") vessel, the S.S. Turkia ("Turkia"). On February 19, 1971 the coils were loaded in No. 2 and No. 4 lower holds on board Turkia. (Exh. 1; Exhs. A and C at 4). They had been received by Hellenic's agents in Baltimore several days, possibly five, before they were loaded aboard. (Tr. 48–50). The coils were wrapped in water-resistant paper, covered with metal sheets on top and bottom and secured to pallet-like bases with metal bands. (Exh. 5). They were loaded two tiers high using forklifts and secured with wires, wood and turnbuckles. (Tr. 88). On the date of loading Captain Karavitis, the master of Turkia, sent a letter of protest (Exh. 23) to the Baltimore stevedores, agents for Hellenic, reciting the fact that a few of the packages were loose, with the covers and straps on eight pieces damaged. After receiving the letter the stevedore repaired and reloaded these pieces. The letter also noted that on 165 packages the metal covers were rusty (Tr. 94); no damage to the coils themselves was observed, however, and a clean-on-board bill of lading was issued, without exceptions. (Exh. 1; Tr. 6).[1]

After Baltimore, Turkia proceeded to New York, arriving there on Saturday afternoon, February 20. On February 22 loading in holds 1 and 4 was commenced at 0800 but stopped at 0930 for the balance of the day because of rain. (Exh. C at 5). Loading was resumed on February 23 and completed on February 24, at which time the vessel was shifted to Leonardo, New Jersey, where loading commenced on February 25. In Leonardo, ammunition destined for Piraeus was loaded in the same hold with 210 of the 264 steel coils and also in the entire 'tween deck above. In loading the ammunition the stevedores added to the lashings of the coils as an added protection to the ammunition. (Exh. A; Tr. 89–90). Loading was completed on March 3, 1971,

---

1. To the extent that damage may have occurred after delivery to the carrier's agents in Baltimore but prior to loading such damage would be the responsibility of the carrier, even though COGSA only applies from the time when the goods are loaded on to the time they are discharged from the ship. *Atlantic Banana Company v. M.V. "Calanca"*, 342 F.Supp. 447, 454 (S.D.N.Y.1972), *aff'd without opinion*, 489 F.2d 752 (2d Cir. 1974). In its answer to plaintiff's interrogatories it appears that exception was taken by Hellenic's agents in Baltimore against the delivering rail carrier to the condition of all the coils. Such rail carrier is not identified and is not a party to this action. Although a substantial number of coils may have exhibited signs of rust at the time of loading which was unknown to the consignee, Hellenic is estopped from asserting this by reason of the issuance of the clean-on-board bill of lading. *Demsey & Associates v. S. S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir. 1972).

and Turkia departed for Piraeus, Greece. (Exh. C at 6).

During the transatlantic crossing rough weather was encountered at the commencement of the voyage, culminating in winds of force 10 which began on the afternoon of March 4 and continued through most of March 5. (Exh. A at 8–9). Water was reported to "have entered in main engine through broken air vent" and various damage to the vessel and deck cargo was noted. (Id. at 9). On March 6 the master noted in the log that "[b]ecause of the bad weather I have run across while under sail and the suffering of the vessel I intend to conduct a detailed inspection upon arrival of the first port of call and to take all necessary steps." (Id. at 10). Turkia reached Piraeus on the evening of March 21, 1971 and commenced discharging cargo the following day. A protest was filed with the Greek court "with respect to the inclement weather" encountered from March 3 to March 6, 1971. An inspection of the cargo was conducted on March 23 and disclosed that ten of the coils in No. 2 lower hold had been slightly damaged. (Exh. C at 17). The master testified at trial that inspections at Piraeus and subsequent ports revealed some damage in that there were dents in the covers of some of the coils. (Tr. 118). Despite the heavy weather, the stow of the coils had not broken.

Turkia departed Piraeus on the evening of March 23, 1971, but shortly after this departure a German vessel, Samba, collided with Turkia, and Turkia's port anchor became entangled in the German vessel. The following day, after the two vessels had been freed, Turkia's bilges and double bottoms were sounded and found dry, and inspection disclosed only minor damage to Turkia. (Exh. C at 18–19). On March 24, 1971 Turkia continued on her voyage, first to Salonica and then to Beirut. However, the shipper, United States Steel International (New York) Inc., subsequently filed a notice of claim with Hellenic regarding any damage to the cargo that might have resulted from the collision. (See Exh. 6). Turkia arrived at Salonica on the morning of March 25 and commenced the discharge

of cargo, which continued on March 26 through March 30, although interrupted in the afternoon of March 27 by rain and delayed on the morning of March 29 for the same reason. (Exh. C at 20–22). On the afternoon of March 30, Turkia departed for Piraeus and arrived there without incident late on March 31, remaining at Piraeus discharging and loading cargo until departing late on April 8, 1971 for Beirut, where she arrived on April 11, 1971. Turkia was unable to enter port until the following day due to bad weather. April 13, 1971 was also rainy, and it was not possible to discharge cargo. However, it appears that only holds 1 and 3 were discharged on this stop at Beirut. Turkia departed Beirut on April 14 for Constanza.

Before discussing the actual events which transpired upon Turkia's arrival at Constanza, the Court must discuss in some detail the general practices surrounding the discharge of cargo in the port of Constanza. Such discharge is under the control of the Rumanian government through two government corporations: Navlomar, a division of the Ministry of Foreign Trade, and Navrom, a division of the Ministry of Transport and Telecommunication. (Exh. 15 at 46). Navlomar is in charge of ships services for all vessels calling at the port. Navrom is a Rumanian government shipping company which has several branches: shipping, forwarding, stevedoring, and harbor facilities. (Id. at 5). The carrier has no choice as to the stevedoring company, which is always Navrom. Nor does the carrier select its agent, which is always Navlomar. (Id. at 29). The vessel is discharged, according to loading plans provided by the vessel's master, by gangs of longshoremen supplied by Navrom, each supervised by a foreman and observed by the chief officer. If the latter observes anything wrong in the discharge he advises the foreman, and the master may thereafter address a letter of protest to the ship's agent, Navlomar, to protect the ship's interest. On the other hand, if the foreman sees damaged cargo in the ship's hold he will not permit that cargo to be discharged until a harbor master offi-

cial comes aboard and prepares a "proces-verbal" or "State Finding Report" indicating what particular cargo is damaged and until that document is presented to the chief officer of the vessel, who, as a rule, refuses to sign it. (*Id.* at 12–13). When discharge of the cargo has been completed, an out-turn report incorporating the information in the proces-verbal is prepared in English by the stevedore and submitted to the master of the vessel, who may or may not sign it. (*Id.* at 28).[2]

■ Turkia arrived in Constanza early on the morning of April 19, 1971, docked alongside a pier and commenced discharging at 0800. In the afternoon she was shifted to another pier and resumed discharging throughout the night of the 19th and all of the 20th, 21st, 22nd and concluding on April 23. (Exh. C at 33–34; Exh. B). According to the testimony of the vessel's master, the unloading by the Rumanian stevedores was highly improper. The stevedores did not use forklifts to move the steel coils to the square of the hatch for unloading by the cranes on the pier. Instead they used wire slings to pull the coils to the square of the hatch. The master protested but the procedure continued, and on April 22nd he dispatched a letter of protest to Navrom (Exh. F) citing the damage to the cargo and the vessel's floor-boards by the method of discharge employed in No. 2 lower hold. Proces-verbals were filed by a representative of the Constanza harbor master on April 19, 20, 21, 22, and 23 detailing the damage to the coils

found prior to discharge.[3] (Exhs. 16–22 incl.). Turkia's master refused to sign these documents. However, after completion of discharge, he did sign the out-turn report dated April 23, 1971, merely remarking that the steel coils had been discharged in an inappropriate manner.[4] (Exh. 7). The out-turn report was, in effect, a summary of the earlier proces-verbals detailing the damage observed prior to discharge. Turkia departed from Constanza on April 24, 1971. When she departed, 51 coils were unacceptable to the Rumanian authorities and were left on the pier under tarpaulin. The remaining coils were shipped to plaintiff's plant in Craiova where they were subsequently surveyed in June 1971. The surveyor found, and the plaintiff agreed after some discussion, that the net damage to the coils should be valued at $14,887.00. (Exh. 9).

■ We turn then to the question of liability as between the consignee of the cargo on the one hand and the vessel and its owner on the other. The plaintiff consignee's prima facie case is established by proof merely of receipt of the cargo by defendant carrier in good order and its delivery at destination damaged. *Daido Line v. Thomas P. Gonzalez Corp.*, 229 F.2d 669, 671 (9th Cir. 1962). The Carriage of Goods by Sea Act of 1936 ("COGSA"), 46 U.S.C. §§ 1300–15, which governs this transaction, is incorporated by reference into the bill of lading covering the cargo involved herein. (Exh. 1). The clean-on-board bill of lading which

---

**2.** The tariffs in effect for the carriage of goods to Constanza, promulgated by the North Atlantic-Mediterranean Freight Conference, were based on "free out," *i. e.*, the carrier did not pay for the unloading at Constanza which was the responsibility of plaintiff, the consignee. As already noted, the stevedores were controlled by the Rumanian Government and every ship coming into Constanza had to use them whether it wished to or not.

**3.** The daily proces-verbals claimed observed damage to 92 coils in all at the time the coils were either in the holds or being discharged. These documents had probative value and were admissible. *United States v. Lykes Bros. Steamship Co.*, 432 F.2d 1076 (5th Cir. 1970).

**4.** Among other things, the out-turn report stated

"—The following coils have been found in the ship's holds with the packing damaged, rusty, without saffty [sic] bands, state of the contents unknown: [134 coils were listed by number]

—The following coils have been found in the ship's holds with the packind [sic] and the contents partly damaged: [16 coils were listed by number]

—The coils nr 9 and 5 coils without number have been found in ship's holds with the packing completely and the contents partly damaged. . . ." Exh. 7 at 2.

In all, 152 coils, according to the out-turn report of April 23, 1971, out-turned damaged.

was issued here constitutes a showing of good condition at time of shipment sufficient for plaintiff's prima facie case. 46 U.S.C. § 1303(4). *Interstate Steel Corp. v. S.S. "Crystal Gem"*, 317 F.Supp. 112, 118 (S.D.N.Y.1970). Since plaintiff met its burden of proving delivery to the carrier in good condition and discharge in damaged condition, the defendant carrier had the burden of proving freedom from negligence. *Schnell v. The Vallescura*, 293 U.S. 296, 304, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *Demsey & Associates v. S.S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir. 1972); *Daido Line v. Thomas P. Gonzalez Corp., supra*, 229 F.2d at 671.

■ It is the carrier's contention that the damage was caused by the Rumanian stevedores who were not under the carrier's control, and it relies upon *Metalimport v. S.S. Italia*, 426 F.Supp. 770 (S.D.N.Y.1976), which it contends presents "circumstances . . . virtually identical" to those of the instant case. Defendant's Post-Trial Brief 7. However, *Italia* is clearly distinguishable factually. In the first place, while there were exceptions taken in *Italia* by the carrier at loading in Baltimore, it does not appear that these exceptions related to rust, whereas in the instant case the master noted that 165 coils had rusty metal covers. In the second place, in *Italia* there was not "any evidence that the cargo sustained damage in transit from Baltimore to Constanza." *Id.* at 772. In the instant case the Turkia experienced heavy weather on the voyage to Piraeus, a collision at Piraeus, and rain during discharging or loading of cargo at New York, Salonica, and Beirut. Indeed, on April 14, 1971, while the ship was at Beirut, the following log entries were made:

"1500 [hours] Continuing to discharge with brief interruption because of the rain and upcoming sailing

. . . . .

"2000 [hours] Finished all discharging. Because of intermittent rains in the course of discharging it is possible that a quantity of the Beirut to Constanza cargo may have been damaged. . . ." (Exh. C at 29).

The latter entry clearly refers to cargo previously loaded and destined for Constanza, since no cargo was loaded at Beirut for Constanza. (Exh. A; Exh. 7).

Furthermore, in *Italia* "the Captain testified that it had snowed in Constanza before the *Italia* arrived and that it was raining a good part of the time during the course of the unloading, and that the coils were unloaded onto the pier and into uncovered railroad cars." 426 F.Supp. at 772. In the instant case there is no evidence of rain or snow during the period that Turkia was at Constanza or of shipment in "uncovered railroad cars." While it is true that in both *Italia* and the instant case the same surveyor attributed the damage to fresh water (or rain) during transit and probably while in the care of the ship, *compare id.* at 771 *with* Exh. 9, in neither case was the surveyor aware of the weather conditions at time of discharge or during prior loading and discharge.

Although the damage claimed herein is primarily due to rust (Exh. 9), to the extent that the coils suffered other damage it is only necessary to refer to two entries in the log. The entry of March 23, 1971 at Piraeus reads as follows:

"1130 [hours]. A pertinent protest was filed with the president judge of the Court of First Instance with respect to the inclement weather which I encountered in the period from March 3 to March 6, 1971. . . . Because of the said inclement weather and following an initial investigation, it was determined that the following cargoes were damaged: 1) Of the cargo from Baltimore for Constanza, 10 pieces of steel skids in hold 2 L/H. . . ." (Exh. C at 17).

The second entry, made in Constanza on April 23, 1971, reads as follows:

"0900 [hours]. Further mine log entry of the 23/3/71 it was observed that due to bad weather six pieces of steel sheets, stored in No. 2 hold (stern) were moved and damaged." (Exh. B).

Thus we find observed damage to at least 16 coils by reason of a shift of the cargo due

661

to the weather and prior to discharge at Constanza. However, the carrier did not establish, or attempt to establish, a "heavy weather" defense, and such evidence as was received fell far short of the requirements in this circuit. *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580, 596–97 (2d Cir. 1971). The rust was clearly not caused by any wind and sea damage to the vessel through which sea water was admitted to the holds, since it is not disputed that the rust was due to fresh water.

In conclusion, the Court finds that the carrier has failed to meet its burden of showing that the damage to the coils was attributable to a cause excepted under COGSA, *i. e.*, the negligence of the Rumanian stevedores, 46 U.S.C. § 1304(2)(q), or perils of the sea. *Id.* § 1304(2)(c).

Accordingly, judgment is entered in the sum of $14,887.00 with interest at 6% per annum from April 19, 1971 to the date of judgment. The foregoing shall constitute findings of fact and conclusions of law of the Court in this case pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The Clerk shall enter judgment as provided in Rule 58 and shall tax costs.