**UNITED STATES FIRE INSURANCE CO., Plaintiff,**

**v.**

**M.V. ASIA FRIENDSHIP, and the M.V. Queen's Way Bridge, their engines, boilers, etc., and Kawasaki Kisen Kaisha Ltd., (K. Line), Defendants.**

No. 78 Civ. 5088.

United States District Court,
S. D. New York.

Aug. 16, 1980.

Vincent, Berg, Russo, Marcigliano & Zawacki, New York City, for plaintiff by Stephen Frank, New York City.

Kirlin, Campbell & Keating, New York City, for defendants by Enrico Sanfilippo, New York City.

## OPINION

SOFAER, District Judge:

This is an admiralty cargo action, brought pursuant to FRCP Rule 9(h), to recover damages arising out of a shipment of acrylic sweaters manufactured in mainland China.

During October 1976, Wessex International Ltd. (Wessex) purchased from a Chinese manufacturer, China National Textile Import and Export Corp. (CNT), an agency of the Chinese Government,[1] two orders of 2,000 dozen acrylic sweaters. (Tr. 97; PX 2) After manufacture, the goods were packaged in 400 master cartons lined with wax paper and stuffed with twenty thin cardboard cartons each of which contained six sweaters individually wrapped in unsealed plastic bags. (Tr. 35, 112–13) The 400 packed cartons were shipped to China National Foreign Transportation Corp.'s Shanghai warehouse and stored there from June 3, 1977 through June 11, 1977. (Tr. 219)

On June 10, 1977, the Chinese Overseas Shipping Agency (COSA), defendant's agent in charge of preparing all shipping documents and handling all the financial aspects of defendant K Line's freight transportation operation in China, issued, in accordance with the payment terms of two letters of credit, two clean-on-board bills of lading. (Tr. 170, 181; PX 7) The bills of lading were numbered "CS 204" and "CS 207." Each bill represented two hundred cartons of acrylic sweaters and was made to the order of the consignee Wessex. (Tr. 219; PX 1) The cargo was thereupon containerized, at defendant's request, and for defendant's convenience. (Tr. 206, 226)

On June 11, 1977 the cargo was loaded on board K Line's ship, *Asia Friendship*, for transshipment at Kobe, Japan. (Tr. 186) The *Asia Friendship* departed from Shanghai on June 14, 1977, arrived in Kobe on June 17, 1977, and on the same day discharged the cargo subject to bills of lading CS 204 and CS 207. Upon discharge, the cargo was stowed near the berth of the *Asia Friendship* until June 27, at which time it was loaded on board another K Line

---

1. Chinese maritime activities are supervised by a number of independently functioning government agencies. (Tr. 171–72, 199) The overall activities of the various agencies are supervised by the "State Council." CNT is not part of this network; the China Overseas Shipping Agency is. (DX–G)

vessel, the *Queensway Bridge*, for shipment to California. (Tr. 190, 202; DX–P) The *Queensway Bridge* left Kobe on June 28, 1977 and arrived at Oakland, California on July 9, 1977. (Tr. 94)

Once unloaded at Oakland the cargo was trucked at K Line's expense to Wilmington and Long Beach, California, delivered into the custody of two K Line agents, International Transportation Services, Inc., and California Cartage Co., and stored at their container stations. (Tr. 47–48) On August 11, Royal Transportation Co., truckers for Wessex, picked up the merchandise, which was packed in 4 containers and 56 loose cartons, and delivered them to plaintiff's warehouse. (Tr. 47, 91) Mr. Montalvo, head of Wessex's shipping department, signed a set of receipts for the goods.[2] Montalvo noted on the receipts that 18 of the 56 loose cartons were still wet, and that all 56 of the cartons had been wet at some time. (Tr. 97, 111; DX–D) Montalvo told Mr. Philips, the Vice-President of Wessex, of the damage, and Philips went to the Wessex warehouse on August 11th or 12th to inspect the merchandise. (Tr. 9–10) At the inspection Philips noted the water damage but made no comment as to the physical condition of the goods. (Tr. 10–11) A few days later, Philips conducted a second inspection at which time he noted that, although the physical condition of the merchandise was good, a terrible odor emanated from both the wet and dry cartons. (Tr. 11, 13)

In an attempt to determine the extent of the damage, Wessex employees opened some of the cartons that were not obviously wet to dry out some of the sweaters and possibly dissipate the smell. (Tr. 12) The smell would dissipate on exposure to the air, but returned after the sweaters were repacked. Wessex shipped some of the sweaters to their customers, but they were rejected and returned to Wessex because of the foul odor. (Tr. 12, 16) Wessex concluded they would be unable to sell the sweat-ers, so on September 20, 1977, they contacted their insurer to recover their losses. (Tr. 11; DX–A)

Plaintiff and defendant agreed that a joint survey be conducted to determine the nature of the damage to the sweaters. On September 30, a joint survey was performed by Mr. Evans of Kelly Hunter and Co., Inc. for plaintiff, and Mr. DePont of Murray Fenton-Cullen, Inc., for defendant. (Tr. 15, 25, 26; Stip. ¶ 14) In their reports both Evans and DePont concluded that an obnoxious odor emanated from all of the sweaters. Evans reported that, upon examination of the visible cartons, it was apparent that approximately 100 of them had been exposed to fresh water and that a random selection and examination of a number of water stained cartons led to findings that their contents were wet. He also reported that, on examining a number of apparently sound cartons, he found the inner boxes affected by mold, and giving off an objectionable odor. (PX–12) Defendant's surveyor reported that in the four containers received by Wessex there were "numerous cartons showing minor to moderate wet staining," black mold, and an unexplained odor which did not permanently disappear even after the sweaters were left to air out for three hours and were then repackaged in new plastic sleeves. (DX–E) DePont determined that 52 cartons were exposed to humid weather conditions and an additional 30% of the remaining cartons sustained minor exterior wet damage. (DX–E, at 4)

Plaintiff's surveyor concluded that the damage resulted from fresh water wetting, with consequent staining of the merchandise by water and mold. Those sweaters not damaged by direct contact with water were contaminated, he felt, by the odor generated by mold, as a result of being confined with the affected cartons. (Tr. 37, 52–53; PX 12) K Line's surveyor determined that, although a large number of

---

2. The exact date on which the cartons were removed from the containers is unclear from the record. But it appears that, with the exception of the 56 boxes delivered loose, the containers were unloaded sometime after their delivery to Wessex's warehouse and prior to August 23, 1977. (Tr. 10, 92; DX–A, D, C)

cartons were exposed to some sort of fresh water damage, the odor in the garments was not caused by wetting but by a defect at some stage of the manufacturing process. (Tr. 64, 65; DX–E) Both parties agreed that the best course of action, given the nature of the damage, was to sell the merchandise for salvage. This was done. United indemnified Wessex for its loss and then brought this action as plaintiff, pursuant to FRCP Rule 17.

■ The legal principles governing the issues in this case are well established. Upon issuance of the bills of lading by defendant's Chinese agent at Shanghai, COSA, the parties became subject to the Carriage of Goods by Sea Act of 1936 (COGSA), 46 U.S.C. § 1300 et seq. (1977). *Demsey & Associates, Inc. v. S.S. Sea Star*, 461 F.2d 1009, 1014 (2d Cir. 1972). When a party proves the merchandise was in good condition at the time of delivery to the carrier, it establishes a prima facie case against the carrier for damage to the cargo prior to redelivery. *See Daido Line v. Thomas P. Gonzalez Corp.*, 299 F.2d 669, 671 (9th Cir. 1962). *Cf. Schnell v. Vallescura*, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934). The burden of proof thereafter rests with the carrier to establish that it received the goods in a damaged condition, or that one of the COGSA exceptions applies. 46 U.S.C. § 1304(2) (1977); *see Schnell, supra; Vana Trading Co., Inc. v. S.S. "Mette Skou,"* 556 F.2d 100, 105 (2d Cir. 1977), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580 (2d Cir. 1971); *McAllister Lighterage Line, Inc. v. S.S. Steel Age*, 306 F.Supp. 19, 27 (S.D.N.Y.1968). Under COGSA, issuance of a clean-on-board bill of lading constitutes prima facie evidence as to the condition of the goods when delivered. 46 U.S.C. § 1303(4) (1977); *Demsey, supra* at 1014; *Metalimport of Romania v. S.S. Turkia*, 443 F.Supp. 656, 659–60 (S.D.N.Y.1977), *aff'd*, 580 F.2d 1045 (2d Cir. 1978); *S.M. Sartori, Inc. v. S.S. Kastav*, 412 F.Supp. 1181 (S.D.N.Y.1976); *Baby Togs, Inc. v. S.S. American Ming*, 1975 A.M.C. 2012, 2016 (S.D.N.Y. 1975).

The ability of parties to rely on representations made in bills of lading is an integral element in maintaining continuity in international commerce. The importance of being able to rely on such representations has been extolled by numerous courts. *See, e. g., Daido Line v. Thomas P. Gonzalez Corp.*, 299 F.2d at 673 n. 9; *Kupfermann v. United States*, 227 F.2d 348, 350 (2d Cir. 1955); *The Carso*, 53 F.2d 374, 378 (2d Cir. 1931), *cert. denied*, 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574 (1931).

■ In this case it is uncontroverted that defendant's agent COSA issued two clean-on-board bills of lading utilized to effectuate payment for the sweaters pursuant to the terms of the letters of credit issued by Israel Discount Bank. The two bills of lading reflect that K Line received, by its agent COSA, 400 cartons containing 4,000 dozen acrylic sweaters, and the failure to note any exception on the bills attests to the good condition of the merchandise at the time of its receipt by K Line.

■ Defendant seeks to avoid the estoppel effect normally resulting from the issuance of these bills of lading by contending that they evidence receipt of containers not cartons. Defendant claims that the Chinese Government, which supervises and regulates all aspects of the Chinese shipping industry, does not allow bills of lading to indicate containerization with any designation other than "CS," and this with reluctance. Therefore, defendant contends, the designation "CS" constitutes an established usage in Chinese-American trade, and bills of lading entitled "CS" evidence receipt of containers not cartons.

The mere appearance of the letters "CS" on the bills of lading provides no notice to anyone that the bills of lading were somehow conditional or represented a containerized shipment, particularly bills of lading that expressly refer to "cartons" having been delivered in good condition to the carrier. Furthermore, "CS" is an ambiguous term, and not an accepted device registered by K Line in its tariffs. (Tr. 215–16) It has no commercial meaning outside of Chi-

na. (Tr. 238) Thus, despite the "CS" designation, both plaintiff's and defendant's surveyors assumed that the goods had been containerized at the point of transshipment, not in China. (See D's Post-Trial Memo., p. 11) To allow defendant to avoid the normal effects of clean bills of lading issued by its agent and shift the burden of loss to plaintiff when K Line has failed to show that Wessex was aware of the special, noncommercial meaning attached to the designation "CS", or that it alerted plaintiff to that meaning, would be unfair. (Tr. 238) *Cf. Flower City Painting, etc. v. Gumina Const. Co.*, 591 F.2d 162, 165 (2d Cir. 1979). *City Savings & Loan Ass'n v. General Ins. Co. of America*, 386 F.Supp. 1210, 1219–20 (N.D.Cal.1974).

Furthermore, defendant's argument concerning Chinese trade usage and law rests entirely on the testimony of Mr. Muira, an employee of K Line, whose testimony is questionable and far from authoritative. It is the testimony of the agent of an interested party, and unconvincing to the extent he contends that the Chinese Government is not subject to some degree of influence by carriers. Muira was not present in China at the time the events of this case occurred, and he is not qualified as an expert in Chinese law. (Tr. 207, 225) Defendant has failed, therefore, to establish that the Chinese Government in fact allows only the designation "CS," or that "CS" means that the shipment involved was received by the carrier in containers, or that significant steps have been taken to convince the Chinese Government to change its rules. (See Tr. 226)

Assuming, however, that the Chinese Government insists upon issuing bills of lading of this kind, this would be no reason to view the effect of the law any differently. K Line, when it does business with the Government of China, accepts the Chinese Overseas Shipping Agency as its agent as a condition of doing that business. Furthermore, nothing in the record suggests that COSA acted in any respect other than as K Line's agent. It was not shown to have had anything to do with the other Chinese agencies, and defendants have made no explicit claim that COSA containerized wet goods without notifying them. Based on the skimpy evidence in the record, it is more likely that if any payments for shipping were made, they were made in such a manner as to evidence a separation of function between the Chinese agencies that produce the goods and the Chinese agencies that accept those goods for distribution to the carrier. (Tr. 227)

No injustice results, moreover, from imposing upon K Line the predictable and known consequences, under established American law, of bills of lading issued in this case. K Line does business in China presumably for profit. It is seeking, in attempting to vary the normal rules that govern bills of lading, to shift a cost of doing business in China from itself to the consignee or its insurer. In fact, the cost involved in this case must have been expected by K Line, since it was well aware that the Chinese Government would refuse to issue bills of lading for containers rather than cartons. Indeed, the complications that have developed from the use of containers in Chinese-American trade are in part K Line's own making. K Line has been in the forefront of urging the Chinese Government to accept the use of containers. (Tr. 239–41; PX–6) Under the circumstances, K Line should have been aware of the problems that could arise, and should be held responsible for them.

■ Defendant also contends that, even if the bills of lading do establish a prima facie case that K Line received the cartons in good condition, the goods were subject to an inherent defect. Defendant correctly argues that, once it has shown the existence of a possibility that the damage to the merchandise was caused by an inherent defect, the burden of proof as to the condition of the goods at the time of receipt by K Line shifts to plaintiff, and the burden cannot be met by presenting clean bills of lading.[3] COGSA, 46 U.S.C. § 1304(2)(m)

---

**3.** Bills of lading can only be utilized to establish the good external condition of merchandise.

*Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan*, 236 F.2d 627 (2d Cir. 1956); *see The*

(1977) In this case, defendant argues that the prima facie case is rebutted by evidence that the goods contained an inherent vice in that they were manufactured in such a manner as to have caused them to give off a fishy odor.

Defendant's evidence of inherent defect was composed of expert testimony by Mr. Gilman. Gilman was an expert in chemistry, not involved in the field of textiles, and with no direct experience in the testing and manufacture of acrylics. (Tr. 258, 281–82, 283) He testified that, although he did not know which chemicals were used to produce the damaged garments, based on his readings in the area of acrylics it was apparent that the odor was caused by the utilization of "impure chemicals" in the manufacture of the garments. (Tr. 256, 275–301, 305) He suggested that the cause of the odor might have been the improper use of an amine which would normally be used in producing the sweaters. (Tr. 257–58) This testimony is so unimpressive that it fails to rebut the prima facie case. Mr. Gilman's credentials were ample for the field in which he functions. But he knows very little about acrylics, and in particular about the manufacture of acrylic sweaters.

■ Assuming, however, that Gilman's testimony would have been sufficient to rebut the prima facie case in the absence of other evidence, plaintiff proved Gilman's testimony unreliable by showing that the damage to the goods resulted from wetting, not from an inherent defect. *Elia Salzman Tobacco Co. v. S.S. Mormacwind*, 371 F.2d

537, 539 (2d Cir. 1967); *Alcan Rubber v. Hellenic Leader*, 1978 A.M.C. 63, 68–69 (S.D.N.Y.1979); *S.M. Sartori, supra* at 1184.

Plaintiff's evidence that the odor was caused by wetting was much more substantial and reliable than the evidence that it was caused by some problem in the manufacturing process. The evidence showed that many cartons were wet when delivered, or had previously been wet. In addition to 56 cartons delivered wet or water damaged, which had been stored in Container KKKLU–06001, shipped subject to Bill of Lading 207, defendant's surveyor noted that about 30% or 100 of the remaining 344 cartons sustained exterior water damage, and plaintiff's surveyor found that about 100 cartons had indications of exposure to water. (PX–12, DX–E). Other cartons, while appearing to be in good order, showed evidence of wetness when opened, including some in which the boxes and sweaters were wet and mold-stained or affected by mold. Moreover, it seems extremely likely that some wet cartons were present in all the containers that were shipped to the United States. The numbering of the cartons relative to the packing slips and the bills of lading demonstrates that wet cartons were shipped subject to both bills of lading, in at least 3 of the 5 containers used. This was shown by the examination of only a handful of over 100 obviously wet containers, indicating that the shipment was thoroughly exposed to water and to the resulting odor of mold. (Tr. 51, 52, 118, 122) [4]

*Niel Maersk*, 91 F.2d 932 (2d Cir. 1937), *cert. denied*, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937).

4. Plaintiff and defendant agree that the 200 boxes of sweaters subject to bill of lading number 207 were stowed in three containers and packed as follows: 72 boxes in container number KKKLU–063120, 72 boxes in container number KKKLU–0633033, and 56 boxes in container number KKKLU–060001. The 200 cartons subject to bill of lading number 204 were packed in two containers as follows: 100 boxes in container number KKKLU–260202, and 100 boxes in container number KKKLU–263698. (Tr. 204–05)

Of the 400 boxes shipped, all 56 cartons stowed in container number KKKLU–060001 sustained water damage. Of the remaining 144 cartons subject to bill of lading 207 and packed in container numbers KKKLU–063120 and KKKLU–0633033 a random examination of three boxes, by plaintiff's surveyor, found the cartons and their contents to be heavily water stained. A similar examination of two boxes from the 200 boxes stowed in the two containers subject to bill of lading number 204 found one of the cartons and its contents to be heavily water stained and mold affected. Although defendant's surveyor did not make note of the specific boxes he inspected, after inspecting a

Furthermore, plaintiff's expert witness testified convincingly that acrylics absorb the odor of mold; that mold has a powerful, long-lasting odor; and that the odor of mold can be transferred from one piece of acrylic through the air into another piece of acrylic which had itself not been in contact with either wetness or mold. This expert witness had a background in textiles, with special expertise in the field of acrylics. (Tr. 310–13) He based his conclusion on previous trial testimony of another witness, on reports as to the condition of the merchandise, and on an experiment that illustrated the effect of mildew on acrylics. (Tr. 325–27, 331–34, 347) He specifically rejected the notion that the odor resulted from an inherent defect in the manufacturing process, pointing out that such a result was extremely unlikely if not impossible. (Tr. 328–29)

Finally, it seems reasonable to require that the issuer of a bill of lading should take all responsible steps to demonstrate that an inherent vice caused the damage in a given case, and not some equally or more plausible explanation. Mr. DePont, defendant's surveyor, had control of the odorous sweaters at the time of the survey. He tested one to determine what kind of water damage had occurred, and established that the damage resulted from fresh and not salt water. He could readily at that time have also tested to determine whether the odor was caused by a chemical that had been improperly used in some stage of manufacture. But he chose not to do so, testifying that as a matter of policy he does not go beyond determining whether damage is caused by salt or fresh water. (Tr. 38)

Under the circumstances of this case, therefore, the defendant had it within its power to provide scientifically reliable information to rebut the normal and important commercial expectations that flow from a representation in its bill of lading.

It did not utilize that opportunity and thereafter agreed that all the sweaters should be sold. It now seeks on the basis of highly speculative testimony to rebut not only the presumptions of the bill of lading, but the credible and responsible hypothesis of damage from wetting. Its belated and inadequate effort is rejected in light of the proof that the odor resulted not from inherent vice but from fresh water wetting and subsequent mold growth which contaminated the entire shipment. *Cf. Playboy Enterprises, Inc. v. Chuckleberry Pub.*, 486 F.Supp. 414, 433 (S.D.N.Y.1980); *Dow Chemical Co. (U.K.) v. Giovanella D'Amico*, 297 F.Supp. 699, 701 (S.D.N.Y.1969).

This opinion constitutes the findings of fact and conclusions of law required by F.R.C.P. Rule 52. Judgment has been rendered in plaintiff's behalf for an amount agreed upon by the parties as damages.

SO ORDERED.

representative number of boxes he determined that aside from the 56 boxes delivered loose, 30% of the 344, or about 104 of the 400 boxes shipped sustained water damage. (PX–E) Plaintiff's surveyor concluded that approximately 100 cartons had "indications of exposure to water." (PX–12)

The fact that four out of the five cartons examined at random were found to have evidence of water damage, and that those four boxes were stowed in at least three of the five containers used in the shipment strongly supports the conclusion that water damaged cartons were stowed and distributed in all the containers.