**CASTLE AND COOKE FOODS, A Division of Castle and Cooke, Inc., Plaintiff,**

v.

**S.S. "TOBIAS MAERSK", "Chastine Maersk", "Clara Maersk", "Thomas Maersk", "Marchen Maersk", "Monterrey", "Charlotte Maersk", "Effie Maersk", "Sally Maersk", "Lica Maersk", "Lexa Maersk", "Trein Maersk", "Leda Maersk", "Cornelia Maersk", "Marit Maersk", "Luna Maersk", their engines, etc.,**

v.

**MOLLER STEAMSHIP COMPANY, A. P. Moller and Maersk Line, Defendants.**

No. 76 Civ. 2656.

United States District Court, S. D. New York.

June 19, 1980.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; Robert J. Phillips, Jr., Paul P. Mathews, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendants; M. E. DeOrchis, N. H. Cobbs, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This cargo damage action was tried to the court on January 22–25, 1980 and the parties have since filed post-trial briefs. The action involves claims of cargo damage suffered in 29 voyages on defendants' vessels involving shipments of canned pineapples being transported from Thailand to New York from mid-1973 to mid-1975. The facts which are undisputed are set forth in the Joint Pre-Trial Order filed January 18, 1980. In brief, on various dates in 1973, 1974 and 1975, Dole Thailand Limited, a wholly-owned subsidiary of Castle and Cooke, Inc., delivered shipments of pineapple product to Maersk Line vessels at Bangkok, Thailand. The names of the vessels and the loading dates are set forth in the Pre-Trial Order. The pineapple product was grown, harvested, processed, canned, labeled, packed and palletized at Dole's plant in Thailand. It was packed in corrugated fibreboard boxes and palletized by use of a break-away glue and plastic straps to secure cartons comprising each individual pallet. Most of the cargo was shipped on 40″ × 48″ wooden pallets.* The cartons were secured to the pallets by plastic straps and were secured to other cartons by glue.

The pallets were trucked from Dole's plant in Thailand to Bangkok, a distance of some 223 kilometers, 23 of which were over dirt roads, for delivery at a pier in Bangkok. Upon arrival at the pier, each shipment was checked for damage by a Dole representative and, where necessary, new cartons and pallets were substituted. On the pier, each shipment was subject to a customs inspection by the Thai government as to the condition of the product to be shipped and whether the amount matched that specified on the commercial invoices. The shipments were transported by lighter to shipside and loaded onto Maersk Line's vessels. Clean "on board" bills of lading were issued with respect to each shipment. Forklifts were used in moving the shipments from place to place.

Upon reaching New York, each of the Maersk vessels docked at Pier 11, Brooklyn, where the pineapples were unloaded by forklift by longshoremen employed by the Universal Terminal and Stevedoring Company. The pallets were moved again by forklift to a special area on the pier where they were checked for damage and exceptions were noted. At these inspections, there were present the trucker who was to take the shipment from the pier and a checker acting on behalf of the stevedore. Tallies were made of the damage in accordance with the instructions given to the checkers by the dock boss and the claims were reviewed by claims adjusters designated for the purpose by Mr. Gabrielle, the Claims Manager for Moller Steamship Co. Mr. Gabrielle testified that if additional damage was found in shipments after they left Pier 11 it was the practice for the consignee to inform the carrier so that the carrier could send a surveyor to check the additional damage. Gabrielle stated that this procedure was not followed in connection with these shipments and, indeed, that he was not informed by either Castle and Cooke or Maher as to the additional damage claimed to have been found when the shipments were inspected at the Maher Terminal.

---

* Three of the shipments were made in sealed containers.

Following the inspection at Pier 11, Brooklyn, the shipments were loaded on trucks hired by Castle and Cooke and transported from Pier 11, Brooklyn to the Maher Terminal in Port Newark, New Jersey. At Maher Terminal, the shipments were again inspected and, according to the plaintiff, shortages and substantial damage were found. There is no evidence that Maher informed Pier 11 or Moller of the additional damage at the time of inspection. Upon the arrival of the shipments at Maher Terminal, employees of the Terminal would check the overall condition of the cargo and note any damage on the exterior thereof. The good pallets were separated from the bad; the damaged pallets would be reconditioned and repacked, where possible, and placed in the good stock area. It was evidently common practice for Maher to reject entire cartons of pineapples if the containers themselves were stained or damaged, even though the cans inside were undamaged. Subsequently, sometimes as long as a week or even two weeks later, damaged cases would be opened and each can inspected. Again, the good cargo cans would be segregated from the bad (Tr. 78). Dented cans would be segregated for salvage, and leaky or crushed cans would be dumped.

Following the inspection at Maher Terminal, the Assistant Manager of Castle and Cooke, Mauricio, would prepare documents for use in the claims to be made against Moller. These documents would be forwarded to Castle and Cooke's Claims Manager, Dolan, at Mountain View, California, who testified as to how the claims against Moller were prepared, based on the documents which he received from Mauricio in Newark. A spot check of the exhibits (Exhs. 36–64) indicates that the time between the checking of the shipments at Pier 11, Brooklyn and the filing of claims by Castle and Cooke against Moller ranged from three months to six months, with an average of approximately four and one-half months.

The only expert testimony produced at the trial was produced by the defendants, who called Mr. Grandpierre and Captain Wheeler, marine surveyors and cargo experts. Both testified that the use of cartons and pallets was acceptable in the transportation of canned pineapples and that it was accepted in the trade that some damage would be unavoidable because of the use of forklifts in moving the pallets from place to place. They testified that it was the custom in the trade that the carrier would expect claims for damage and that if the claims became substantial, the carrier would apply to his Ocean Conference for an increase in the shipping rates. While damage by reason of the use of forklifts was to be expected, it was considered *de minimis* by the trade and usually not compensable. Exh. EE indicates the ratio of damage to invoice price observed upon the delivery of the shipments at Pier 11, Brooklyn which were compiled from the pier delivery tallies included in the truckers' records submitted into evidence by plaintiff. Captain Wheeler testified that since Castle and Cooke did not promptly notify the defendants that additional damage had been found at the Maher Terminal and had not invited defendants to send a surveyor to make a joint survey he was of the opinion that the defendants' liability terminated at the time Castle and Cooke, through private truckers, took delivery of the shipments at Pier 11, Brooklyn.

Under the Carriage of Goods by Sea Act, 46 U.S.C. § 1303 ("COGSA"), Castle and Cooke had the initial burden of proving delivery of the goods to the carrier in good condition and outturn by the carrier or by the stevedore in damaged condition. *M. W. Zack Metal Co. v. S.S. Birmingham City*, 311 F.2d 334, 337 (2d Cir. 1962), *cert. denied*, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963). Castle and Cooke has established a prima facie case of liability by showing receipt of the goods by the carrier in good condition and delivery in damaged condition. Clean bills of lading were issued with respect to each voyage. The plaintiff is not required to "introduce evidence as to actual inspection of the internal composition" of the shipments prior to shipment to prove its good condition. *Sartori, Inc. v. Kastav*, 412 F.Supp. 1181, 1183 (S.D.N.Y.1976). *See*

**1308**

*Kupfermann v. United States*, 227 F.2d 348, 349–50 (2d Cir. 1955). The deposition testimony of Mrs. Panie taken in Bangkok as to the preparation of the cargo at the plantation, the checks made in Bangkok, along with the clean bills of lading, established the good order of the cargo. It is undisputed that the shipments that arrived at Pier 11, Brooklyn, had suffered some damage as shown in Exh. EE. Since the court concludes that the damage ascertained at Pier 11 was not *de minimis*, the defendants are liable to Castle and Cooke for these damages.

However, we find that defendants' liability terminated upon the outturn of the goods at Pier 11, Brooklyn. With respect to any damage claimed which was not apparent at the time of the outturn, Castle and Cooke had the duty to notify the carrier within three days, 46 U.S.C. § 1303. Moreover, under COGSA, Castle and Cooke had the burden to show that such damage was present at the outturn at Pier 11. *See Associated Metals & Minerals Corp. v. M/V Rupert de Larrinaga*, 581 F.2d 100, 101 (5th Cir. 1978); *Hartford Insurance Co. v. M.V. Athinai*, 1979 A.M.C. 794 (S.D.N.Y.1979). The record here demonstrates that substantial delays occurred before defendants were notified of the damage allegedly found at Maher Terminal. Moreover, the testimony indicates that the inspection at Maher Terminal went beyond that of determining the damage sustained during the voyage. It was also for the purpose of reconditioning and sprucing up the shipments to impress Castle and Cooke's customers, including supermarkets and wholesalers, with the high quality of the shipments.

The foregoing constitutes the Court's findings of fact and conclusions of law. (Fed.R.Civ.P. 52(a)).

The Court understands that the parties agree as to the amount of damages revealed at Pier 11, so that judgment for Castle and Cooke may be entered accordingly.

Settle judgment on notice.