SUMITOMO CORPORATION OF AMERICA, Plaintiff,

v.

M/V "SIE KIM", her engines, boilers, etc.

v.

COMPANHIA de NAVEGACAO LLOYD BRASILEIRO and Sabah Pacific Shipping Co., S.A., Defendants.

COMPANHIA de NAVEGACAO LLOYD BRASILEIRO, Defendant/Third-Party Plaintiff,

v.

ATLANTIC & GULF STEVEDORES, INC., Third-Party Defendant.

No. 82 Civ. 5025.

United States District Court, S.D. New York.

Aug. 27, 1985.

Bigham Englar Jones & Houston, New York City (William R. Connor, III and John E. Cone, Jr., of counsel), for plaintiff.

Crowell, Rouse, Varian, Hagen & Matera, New York City (Francis R. Matera, P.C., of counsel), for defendant/third-party plaintiff.

McHugh, Leonard & O'Connor, New York City (Douglas A. Franklin and John P. Conroy, of counsel), for third-party defendant.

GAGLIARDI, Senior District Judge.

Plaintiff Sumitomo Corporation of America ("Sumitomo America") commenced this action in admiralty against Defendant Companhia de Navegacao Lloyd Brasileiro ("Lloyd") to recover for damages to a cargo of steel pipe carried from Brazil to Texas by Lloyd on the M/V Sie Kim. Lloyd has entered an indemnification claim against Atlantic & Gulf Stevedores, Inc., the discharging stevedores at Houston, Texas. The parties have submitted numerous deposition transcripts and exhibits to the court, along with stipulations and legal memoranda.[1] By agreement of the parties, the case was tried on the basis of these submissions. The following constitutes the court's findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

### Background

In 1981, Sumitomo Corporation do Brasil ("Sumitomo Brazil") purchased a quantity of 13⅜" diameter steel casing pipe from Confab Industrial S.A. ("Confab"), a manufacturer of steel pipe. The purchased pipe was of two types. Some weighed 68 pounds per linear foot ("the 68# pipe"). Some weighed 54.5 pounds per linear foot ("the 54# pipe"). All pipe was designated "R-3," meaning that the pipes could be of random lengths between 37 and 43 feet.

The pipe purchased by Sumitomo Brazil was sold to Sumitomo America "C & F Houston", for delivery at Houston, Texas. Sumitomo Brazil and Sumitomo America are distinct but related corporate entities. Neither owns stock in the other; the corporations have no directors in common. Both, however, are subsidiaries of Sumito-

---

1. In the text, deposition transcripts will be referred to by the last name of the witness, followed by the word "Dep." and a page reference. Unless otherwise indicated, all references are to the first volume of a deposition transcript.

mo Corporation of Japan. Aizawa Dep. 9, 116; Fukukita Dep. 10.

Sumitomo America in turn contracted to sell the pipe. Through transactions which involved the Chicago and New York offices of Sumitomo America, the 54# pipe was committed for sale to the McJunkin Corporation, an unrelated corporation. McJunkin then committed the 54# pipe for sale to Gulf Fabricating & Supply, Inc. ("Gulf"). In transactions which involved the Chicago and Los Angeles offices, a large quantity of 68# pipe was sold to Gulf, through W.W. Young Interests, Inc. ("Young"), its parent company.[2] Additional Confab pipe was sold to businesses unrelated to Gulf.[3]

All of the pipe purchased from Confab was shipped to Houston, Texas, aboard the M/V Sie Kim. On the relevant bills of lading, Sumitomo Brazil is designated the shipper. Ex. A-1; B-1. Lloyd, the time charterer of the vessel, is designated the ocean carrier. Four on-board bills of lading ("B/L") cover the shipment of Confab pipe. Two of them, nos. 601 and 604, are of little concern here.[4] The others, 602 and 603, cover the cargo ultimately destined for Gulf. All of them specify that the shipment is to be "FILO", i.e., free-in, liner-out.

The pipe transported under B/L 601–604 was manufactured by Confab in Pindamonhangaba, Brazil, in early August or September, 1981. At that time, the pipes, including their threads, were inspected, and protective rings ("thread protectors") were placed on each end of each pipe by hand. Ferreira Dep. 21, 23. The thread protectors were then hand-tightened, possibly using a wrench, and the pipes were put into open-air storage on wooden fans until late October. Ferreira Dep. 48–49. The storage conditions at Pindamonhangaba were intended to comply with the recommendations of the American Petroleum Institute (the "API") for such pipe. Ferreira Dep.

48. There is no specific evidence concerning the handling of the pipes during their transfer to the storage area or during their transfer from the storage area to the embarkation platform from which they were loaded onto trucks for transport.

On October 20, 1981, the pipe was placed on trucks for transport to Rio de Janeiro and loading on the M/V Sie Kim. Ferreira Dep. 49. There is no record of any significant damage to the pipe during loading operations at the Confab mill. Ferreira Dep. 24–25. Such records would ordinarily appear if there had been an "accident" during loading. The trucker has no records concerning the shipment's transport to Rio de Janeiro. Della Volpe Dep. 5–7. Upon reaching Rio de Janeiro, the pipe was loaded directly from the trucks onto the M/V Sie Kim. Dos Santos Dep. 11; cf. Della Volpe Dep. 11 (concerning usual practice). An agent of Confab Transport who visually inspected some of the pipe on the trucks before loading recalls no apparent significant damage, but made no records concerning the cargo. Dos Santos Dep. 13, 19, 28–29. A surveyor acting for the shipowner saw some damaged pipes on the trucks and indicated to the ship's Master that the bills of lading should be claused. Valadao Dep. 32, 33. The agent considered the damage to be minor. Ex. 1 at 7; Valadao Dep. 40. Some of the damaged pipes observed may have belonged to B/L 602 and 603. They also may have belonged to other shipments.

It was understood between Confab, Sumitomo Brazil, and Lloyd that Confab and Sumitomo Brazil would supervise and pay for the loading, employ the necessary stevedores, and see to it that any necessary dunnage was provided. In Rio de Janeiro, the Confab pipe was loaded and stowed by unionized stevedores employed on behalf of

---

**2.** Gulf processes pipe such as that manufactured by Confab into a form usable directly in drilling for oil.

**3.** The additional pipe was carried under bills of lading nos. 601 and 604. Sumitomo America's claim relates only to the pipe ultimately intended for Gulf. The contracts of sale to McJunkin and Young specify that the pipes are sold ex-dock Houston duty paid, that the seller will provide insurance, and that the buyer bears the risk after delivery of the goods to the carrier.

**4.** See n. 3, supra.

Sumitomo Brazil, but paid by Confab. Miranda Dep. 36, 37. The crane operators were supplied by the Port Authority, as apparently is required, and paid by Confab. Miranda Dep. 25–26, 37. While the stevedores may have acted independently in many respects, they did receive supervision from agents of Confab and Sumitomo Brazil. Dos Santos Dep. 4, 6, 10, 12–14, 26, 29; Miranda Dep. 21–26, 41, 43, 44. Lloyd exerted no control over the manner and method of loading the Confab pipe. The Master of the M/V Sie Kim played a minor role. He determined that there was insufficient space to load all the Confab cargo and issued a statement to that effect. Ex. A–64. He also, through a vague statement whose meaning is unclear, apparently indicated his approval of the final stow. Ex. A–65.[5]

At the time of loading, some difficulty was experienced. In hatches used to stow the Confab cargo, the lower sections were occupied by bundles of smaller steel pipe loaded at a different port (the port of Santos). Miranda Dep. 13–21. The Santos cargo occupied more space than had been anticipated. As a result, the Confab shipment was shortloaded. In addition, in some cases the Santos cargo did not provide a uniform surface upon which to load the Confab cargo (Valadao Dep. 11), so it was necessary to put timbers over the cargo in various locations to level it out. Valadao Dep. 12. Once this was done, it became possible to stow the Confab pipe in a level or very nearly level manner. Ex. 1; Valadao Dep. 15, 17. The Santos cargo may have settled somewhat when the Confab cargo was loaded. Dos Santos Dep. 14, *but see* Valadao Dep. 16–17. There is no persuasive evidence that this in any way damaged the Confab cargo, however, or that it contributed to any later settling or shifting in the Confab cargo. *Compare* Ex. 1; Ex. C–8.

Another problem arose from the varying ("random") lengths of the Confab pipes. By and large, the pipe was stowed in two courses, one fore and one aft in the hatch, each with the pipe parallel to the sides of the vessel. The front ends of the pipes in the "fore" course were placed so that they touched the bulkhead. Similarly, the rear ends of the "aft" course of pipes were placed so that they touched the bulkhead. Had the pipes been of uniform length, this would have left a fairly uniform open space between the two courses, one in which dunnage could have been placed. As it was, the space left open between the two courses of pipe was irregular, with some pipe ends touching, and others overlapping. Ex. 1; Wall Dep. 35, 47, 82. There is no record of any attempt to match longer pipes in the fore course with shorter pipes in the aft course and vice versa.[6] Certain pipes banged against the fittings of the ship and the bulkheads during loading. Ex. 1; Valadao Dep. 21, 22, 34, 48. The loading survey report indicates that a large number of pipes received "edge dent" damage during loading at Rio. The listing is such, however, that it is difficult to determine whether damage notations apply to the specific bills of lading at issue. Ex. 1.

As finally stowed, the Confab pipes were level. Ex. 1; Valadao Dep. 8–12, 13, 17. Where two courses of pipes were used, the stow, although level, was irregular in the manner described above. Ex. 1; Butterworth Dep. 17–19. Although some timbers

---

5. The court does not give substantial weight to the Master's statement (ex. A–65). There has been no satisfactory explanation of the circumstances of its issuance or its intended use. There is no evidence that the Master closely supervised or intervened in the loading process. With respect to loading damage, there is little to suggest that the Master could or should have noted the damage at issue here. Further, the phrase "shipment to Confab" suggests that the Master may have been referring to the voyage between Santos and Rio.

6. The court construes many of the comments concerning the improper stowage of the Confab cargo to reflect the irregular nature of the gaps between the two courses and the use of an athwartship stow for part of the cargo in hold # 1. It considers criticisms of the stow of the Santos cargo to reflect the fact that athwartship stowage was used and that the Santos cargo occupied more space than had been allocated.

separated Confab cargo from the other cargo, no dunnage separated the individual Confab pipes from one another, or the pipes covered by one bill of lading from pipes covered by another Sumitomo Brazil bill of lading. Hopkins Dep. 32. The only identification of pipes according to the bill of lading number was by colored straps or tape placed on each pipe. Hopkins Dep. 32; ex. 1. The top layer of Confab pipe in each hatch was secured by wires running crosswise across the cargo. Fewer wires were used in hold # 1.

After loading, the Master of the M/V Sie Kim signed the on-board bills of lading as "clean" bills of lading. Ex. A–1, A–55, B–1, B–63; see also ex. A–65. B/L 602 and 603, as signed, contained no exceptions with respect to the cargo.

The voyage from Rio de Janeiro to Houston was uneventful. Ex. 3 (Log Book). There is no evidence that the vessel encountered any unexpected or heavy weather. A record of heavy weather would ordinarily appear in the log had rough weather occurred. Wall Dep. 86–88.

Upon arrival at Houston, the cargo assigned to B/L 602 and 603 was discharged directly onto the trucks which transported the pipe to Gulf's facility at Breen Road, about 35 miles away. Prior to discharge, the position of the cargo was not significantly different from that at the completion of loading in Rio de Janeiro. Butterworth Dep. 16, 20–24, 61–68; Wall Dep. 42–43, 86–88. The cargo had remained level. See, e.g., ex. C–8. Where the pipe was stowed in two courses, one end of each course remained close to the bulkheads. Rogers Dep. 13; Butterworth Dep. 19; Blackburn Dep. 22. The irregular gap between the two courses persisted. Ex. C–8.

Some difficulties were experienced at discharge. Discharge was slow, in part because the pipes were not segregated by dunnage according to the bills of lading. Hopkins Dep. 32, 131, 133, 153–54; Blackburn Dep. 37–43; ex. C–8. In this sense, the pipes were "mixed up," since stevedores ordinarily discharge by bills of lading in order to ensure delivery of the proper

goods to each customer. Hopkins Dep. 32, 131. Discharge was also made more difficult by the use of the two-course stowing technique with the loose, random-length pipe, where it not only caused an irregular gap or overlap between the fore and aft courses (Rogers Dep. 55; Blackburn Dep. 42), but also necessitated use of break-out wires and painstaking alternation between the fore and aft courses. Rogers Dep. 21. The result was a slow discharge, with "lifts [which] were frequently small." Ex. C–8. The problem was particularly severe in hold # 1, which was smaller than the others. Butterworth Dep. 76. Checkers working with the stevedores in the hatches at the time of discharge observed the stow and reported visible damage to a small number of the Confab pipes. Blackburn Dep. Part II, 16–17. Exceptions were noted for twelve of the pipes under B/L 602 and 603. Blackburn Dep. 40; exs. C–16, C–17. Ten of the twelve were expressly labeled "found in stow." Although there is evidence that pipes occasionally will bang against a ship during discharge, there is no convincing proof that such banging took place during this discharge. Blackburn Dep. 33–40; Rogers Dep. 23–28.

There is no record concerning the truck transport from Houston to Gulf, about 30 miles from the port. Plaintiff and defendant, however, have stipulated that no damage occurred at that time. There is testimony that there was no mishap during unloading at Gulf. Capers Dep. 10–13. However, contrary to custom, there was no inspection for visible damage, though some was seen. Capers Dep. 18–20; Hopkins Dep. 74.

The pipe delivered to Gulf from the M/V Sie Kim remained at the Gulf facilities at Breen Road for several months. During this time, the pipe was preliminarily inspected by Toplis and Harding, a general marine surveyor, and some obvious damage was noted. Nagy Dep. 16. Considerably later, after an unexplained delay, the cargo received a detailed inspection of the ends, especially the threads, by Coulter-Mustang, a thread inspection service with

which Toplis and Harding subcontracted. Immediately prior to the inspection by Coulter-Mustang, the pipes were handled by employees of two other companies, Down Hole Tubular Inspection, Inc., and Steele Pipe Service. They were employed to remove the protectors from the ends of the pipe and clean the threads by removing the lubricant, so that the threads and any damage would be exposed for testing.

Until the inspection by Coulter-Mustang was completed, all the pipe was stored at Gulf's Breen Road facility. Much of the pipe which passed inspection was then delivered to Gulf's customers. No witness recalls any mishap or damage to the pipe during storage or during preparation for or conduct of the inspections. Hopkins Dep. 162-165; Capers Dep. 9-11. The pipe was not moved except for inspection purposes. Capers Dep. 9. It is not clear, however, that a record would ordinarily have been made had there been a mishap which led workers to believe they had damaged the material. Hopkins Dep. 165-66.

At the time of the thread inspection, Down Hole Tubular Inspection, Inc., and Steele Pipe Service made reasonable efforts to remove all the thread protectors, using large wrenches. No machine or power tool was used to remove the protectors. Special techniques to remove protectors are not commonly used in the trade at the time of inspection, since it is very probable that the threads are damaged if a protector can not be removed without the use of a torch, a power tool, or other machine.[7] Ferreira Dep. 27; Seo Dep. 30-31; Sirico Dep. 11-12, 43-46.

Despite their efforts, Down Hole Tubular Inspection, Inc., and Steele Pipe Service were unable to remove protectors on a number of the pipes delivered under B/L 602 and 603. Most of the stuck protectors were on the "pin" or "male" ends of the pipe, where the protector and threads are on the outside of the pipe and most susceptible to damage. Sirico Dep. 49. These pipes were rejected, as is customary in the industry. Sirico Dep. 11, 32. A number of the pipes on which the protectors were removed were also rejected. The major reasons cited for rejection were torn threads, bent couplings, mashed threads and bent pins.[8]

The rejected pipe was ultimately sold at salvage for repair and resale by the salvage company. Aizawa Dep. 68, 165; Martin Dep. 15-16. Bids were received from four salvage companies on the basis of a solicitation which described the pipes as casing pipe with "bent ends," ex. B-52, a term which suggests more severe damage than does "stuck protectors." Sumitomo America did not seek or receive any bids from companies which would simply repair the pipe and return it to Gulf. Aizawa Dep. 165.

Sumitomo America received the proceeds from the salvage sale. Gulf and McJunkin have been credited for all amounts charged for the rejected pipe and have been refunded the cost of the inspections. Sumitomo America has not recovered any damages from Sumitomo Brazil or Confab for the rejected pipe. Aizawa Dep. 70-72, 132, 158. Rather, it seeks to recover against Lloyd, on the ground that it has established a claim under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.*

### Discussion

#### I. *General Provisions of COGSA*

COGSA defines the duties, responsibilities, rights, and immunities of ocean "carri-

---

**7.** Such special removal techniques may be used to forcibly remove protectors prior to a repair effort. The normal method used to repair pipes with stuck protectors, however, is to cut off the damaged ends and re-thread, re-bevel and reinspect the now-shortened pipe. Sirico Dep. 19-24. The machines used to do this are found primarily in businesses which specialize in repairing pipe. Sirico Dep. 43, 57.

**8.** The term "coupling" refers to the "female" or "box" end of the pipes, where the threads (and the protectors) are on the inside surface of the pipe. The term "pin" refers to the "male" or "field" of the pipe where the threads and protectors are on the outside of the pipe, and thus more exposed. Some submissions before the court appear to confuse "coupling" with "thread protector." They are not the same.

ers," a term which includes time charterers such as Lloyd who enter into a contract of carriage with a shipper. *See* 46 U.S.C. § 1301. Its provisions apply to "contracts of carriage." 46 U.S.C. § 1300. Bills of lading constitute contracts of carriage "from the moment at which such bill[s] of lading regulate[ ] the relation between a carrier and a holder of the [bills of lading]." 46 U.S.C. § 1301(b).

Under COGSA, a carrier is bound to exercise due diligence to make the ship seaworthy. 46 U.S.C. § 1303(1). A carrier also "shall properly and carefully load, handle, stow, carry, keep, care for and discharge the goods carried." 46 U.S.C. § 1303(2). However, a carrier is not liable for damages resulting from unseaworthiness if it can show that due diligence was exercised. *See* 46 U.S.C. § 1304(1). A carrier also is not responsible if cargo loss or damage results from an "[a]ct or omission of the shipper or owner of goods, his agent or representative ...;" 46 U.S.C. § 1304(2)(i); or if the loss or damage arises "from an inherent defect, quality, or vice of the goods;" 46 U.S.C. § 1304(2)(m). Finally, a carrier can exempt itself from liability if it can establish that cargo loss or damage results from "[a]ny other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier...." 46 U.S.C. § 1304(2)(q).[9]

 Where goods are damaged between the time of manufacture and delivery to the ultimate buyer, a shipper or consignee can establish a prima facie case under COGSA for recovery of damages from the carrier if he can show that the damage occurred while the goods were in the custody of the carrier. *See Nichimen Company v. M.V. Farland,* 462 F.2d 319 (2d Cir.1972). This can be done through proof of delivery of the goods in good condition to the carrier and discharge in damaged condition. *See Caemint Food, Inc. v. Lloyd Brasileiro,* 647 F.2d 347 (2d Cir.1981) ("Caemint Food"); *Metalimport of Romania v. S.S. Italia,* 426 F.Supp. 770 (S.D.N.Y.1976). A "clean" bill of lading without exceptions is prima facie evidence of delivery in good condition to the carrier. *See Associated Metals, Etc. v. M/V Rupert de Larrinaga,* 581 F.2d 100 (5th Cir.1978) ("Associated Metals"); *Caemint Food, supra.* Where, however, the damage is of a kind which would not be apparent on visual inspection of the goods, a clean bill of lading is prima facie evidence only of delivery to the carrier in "apparent" good condition. *See Caemint Food, supra.* In such cases, a plaintiff may establish a prima facie case of damage during the carrier's custody through evidence concerning the type of damage and the nature of the goods. Proof of actual inspection at the time of shipment is not required. *See Caemint Food, supra; Castle and Cooke Foods v. S.S. Tobias Maersk,* 491 F.Supp. 1305 (S.D.N.Y.1980).

 Proof of discharge in damaged condition ordinarily requires prompt written notice of loss or damage and the general nature of such loss and damage to the carrier or his agent at the port at the time of discharge. 46 U.S.C. § 1303(6); *see, e.g., Castle and Cooke Foods v. S.S. Tobias Maersk, supra.* If damage is of a kind which would be apparent, removal of the goods into the custody of a person entitled to delivery without such written notice to

9. The provisions of the Harter Act, 46 U.S.C. § 190 *et seq.,* define carriers' responsibilities in certain situations where COGSA does not apply, *e.g.,* in domestic trade, during any preloading period in which the carrier has custody of the cargo, and during the period between discharge from the vessel and delivery to the consignee. The Harter Act prohibits enforcement of stipulations in bills of lading purporting to relieve a carrier from "liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care or proper delivery of any and all lawful merchandise properly committed to its or their charge." 46 U.S.C. § 190. It also prohibits enforcement of provisions which weaken a vessel owner's obligations to "exercise due diligence to properly equip, man, provision and outfit [the] vessel," to make the vessel seaworthy, and to "carefully handle and stow her cargo and to care for and promptly deliver same...." 46 U.S.C. § 191. Because of the similarity to COGSA, cases under the Harter Act often are used in analysis of COGSA.

the carrier is prima facie evidence that the goods were delivered in the condition specified in the bill of lading. *See* 46 U.S.C. § 1303(6). If the loss or damage is of a kind which would be apparent at discharge, notice must be given within three days of the delivery. *Id.* Failure to give timely notice creates prima facie evidence of delivery of the goods in the condition specified in the bill of lading. *See Associated Metals, supra; see, e.g., Castle & Cooke v. S.S. Tobias Maersk, supra; Gradmann & Holler GmbH v. Continental Lines, S.A.,* 504 F.Supp. 785 (D.P.R.1980).

If and when a shipper or consignee establishes that the goods were damaged while in the custody of the carrier, the burden may switch to the carrier to establish one of the defenses recognized under COGSA. *See Caemint Food, supra.* The carrier has a defense if it can demonstrate absence of fault, either through a showing of the exercise of due diligence to make the ship seaworthy, 46 U.S.C. § 1304(1) or through a showing of freedom from negligence on the part of the carrier or its employees or agents. 46 U.S.C. § 1304(2)(q); *see generally Quaker Oats Co. v. M.V. Torvanger,* 734 F.2d 238 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985). As noted earlier, the carrier also has a defense if it can establish that the damage was caused by an "act or omission of the shipper or owner of the goods, his agent or representative," or by an "inherent vice or quality" of the goods. *See Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225 (11th Cir. 1983).[10]

## II. *Allocation of Risk*

▮ COGSA renders null and void provisions in bills of lading which purport to limit a carrier's liability for loss or damage arising from "negligence, fault, or failure in the duties and obligations" specified in 46 U.S.C. § 1303(1) and (2).[11] *See* 46 U.S.C. § 1303(8). Contractual provisions not in conflict with COGSA, however, are enforceable. *See e.g., Atlas Assurance Co., Ltd. v. Harper, Robinson Shipping Co.,* 508 F.2d 1381 (9th Cir.1975); *St. Ioannis Shipping Corp. v. Zidell Explorations,* 222 F.Supp. 299 (D.Or.1963), *aff'd,* 336 F.2d 194 (9th Cir.1964).

Several terms may be used in bills of lading to describe the allocation of responsibilities between the carrier and the shipper. One such term is "free-in, liner-out" ("FILO"). A FILO provision in a bill of lading means that the shipper will be responsible for loading the cargo and will employ and pay the stevedores and other personnel needed for loading. Aizawa Dep. 41–42; Seo Dep. 22–24; Wall Dep. 62–68, 83–84; *id.*[12] The cost of loading thus is not included in the carrier's charges. At discharge, however, the carrier organizes, supervises, and pays for the necessary services. These costs are included in the fee for carriage. A bill of lading may specify instead "free-in, free-out" ("FIFO") or "free in and out" ("FIO"), which means that the shipper supervises and pays for both loading and discharge. *See Atlas Assurance Co., Ltd. v. Harper, Robinson Shipping Co., supra; St. Ioannis Shipping Corp. v. Zidell Explorations, Inc., supra.*

▮ The contract of sale which underlies a given bill of lading will define the responsibilities of the shipper vis-a-vis the buyer. The term "C & F ____" [place named]" is one commonly used to indicate that the price to the consignee includes freight charges to the place named. *See,*

---

**10.** It is not entirely clear whether the burden with respect to exceptions listed in 46 U.S.C. § 1304(2)(a)–(p) lies on the plaintiff or the defendant. *See Caemint Food, supra,* 647 F.2d at 356 n. 9.

**11.** This is also the case under the Harter Act, as noted earlier. *But see* 46 U.S.C. § 1306 (under COGSA, special agreements with respect to par-

ticular goods permitted under specified circumstances).

**12.** See also the cases of *Atlas Assurance* and *St. Ioannis,* discussed *infra.* The testimony of witness Miranda, although less detailed with respect to the meaning of the FILO provision, does not contradict the definition given by the other witnesses.

*e.g.,* N.Y. UCC § 2–320 (McKinney 1964). Unless otherwise agreed, under C & F terms title and risk of loss pass to the buyer at the time of shipment. *See* N.Y. UCC § 2–320, comment 16 (McKinney 1964); Gilmore and Black, *The Law of Admiralty* § 3–8 (1957); *Gradmann & Holler GmbH v. Continental Lines, S.A., supra.* Alternative provisions for allocation of risk between buyer and seller include "FOB" terms and "FAS" terms. "FOB _____" [the place of shipment] requires the seller to bear the risk until goods are put into the possession of the carrier. "FOB _____" [a specified vessel] requires the seller to bear the risk and expense until the goods are loaded on board and the seller obtains an on-board bill of lading. "FAS _____" [a specified vessel] requires the seller to bear the risk and expense until the goods are delivered alongside the vessel in the manner usual in that port. *See* N.Y. UCC § 2–319 (McKinney 1964); Gilmore and Black, *The Law of Admiralty* § 3–8 (1957).

Applying COGSA and the contractual provisions of the bills of lading, it is apparent that the plaintiff cannot prevail. First, Sumitomo America has not established a prima facie case against Lloyd under COGSA. Second, even if the court assumes that Sumitomo America has established a prima facie case for the recovery of damages, there is sufficient evidence on record to support several defenses under 46 U.S.C. § 1304(2).

III. *Plaintiff's Case*

A. *The Condition of the Cargo at Loading*

■ Under COGSA, a plaintiff can establish a prima facie case for recovery of damages if he can show delivery of the cargo in good condition to the carrier and discharge in damaged condition. *See Nichimen Company v. M.V. Farland, supra; Associated Metals, supra.* In this case,

the record shows that the Master of the M/V Sie Kim issued clean on-board bills of lading for the pipe destined for Gulf. The clean on-board bills of lading are prima facie evidence that the pipes were in apparent good order at the time they came into Lloyd's custody. *See The Niel Maersk,* 91 F.2d 932 (2d Cir.1937), *cert. denied,* 302 U.S. 703, 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937); *cf. Caemint Food, Inc., supra.* A finding of apparent good order also is suggested by evidence that the pipes were in apparent good order at the time of their manufacture and that no obvious substantial harm befell them on their transport from Pindamonhangaba, Brazil, to the port at Rio.

■ The evidence is insufficient, however, to support a finding that the pipes were in actual good order at the time loading was completed. Much of the damage to the pipes was of a kind which would not be apparent to those without special training and, in many cases, not apparent to those without special tools and instruments as well. Sirico Dep. 46–47; Nagy Dep. 10–11; Hopkins Dep. 148; Capers Dep. 30–31. Plaintiff has not established that the personnel of Lloyd, M/V Sie Kim, Confab, or Sumitomo Brazil who had some contact with the pipes after their arrival (on trucks) at Rio had the special training or tools necessary to make their failure to report significant damage an indication that there was no actual damage. In addition, plaintiff has provided no proof that Lloyd or Sie Kim personnel should reasonably have had such training or have undertaken a detailed inspection. Because of the nature of the damage, then, the clean bills of lading do not establish actual good order and the court must examine other evidence. *Cf. Castle and Cooke Foods v. S.S. Tobias Maersk, supra* (clean bill of lading is prima facie evidence of actual good order if carrier had obvious opportunity for inspection).

■ Sumitomo America has presented some evidence to suggest that the pipes were in good order at the time they arrived

in Rio. *But see* Valadao Dep. 32–33, 40. Even if the court treats that evidence on the care and condition of the pipes at the time of manufacture and at the time of arrival at the port of Rio de Janeiro as establishing the actual good order of the pipes at the commencement of loading onto the M/V Sie Kim,[13] the evidence concerning the loading process itself poses a problem. Thus, it cannot be said that plaintiff has established that the pipes were in actual good order at the completion of loading onto the M/V Sie Kim.

Witnesses testified to the relatively high risk of damaging pipes such as these during loading. Rogers Dep. I, 30, 43; Rogers Dep. II, 11. Random lengths hamper loading, especially where pipe is to be stowed in two courses. Wall Dep. 81. While the Confab employees who supervised loading have no recollection of any mishaps during loading, they cannot account for the entire loading period and thus cannot show that the pipes were not banged or that no mishaps occurred. There is evidence of visible damage and of banging at the time of loading. Ex. 1, pp. 7–9; Valadao Dep. 21–22. Also, since much of the damage ultimately found would not have been visible to the stevedores or the Confab employees supervising the loading, "mishaps" which took place might not have seemed worth recording or reporting because they caused no apparent damage. The only witness who states that there was no damage during loading, Dos Santos, bases his opinion in large part on visual inspection of previously loaded pipe, rather than on direct observation of the loading process. Finally, no witness was able to state that the damage at issue was of a type unlikely to have occurred at or before loading. Wall Dep. 104–07; Nagy Dep. 38; Rogers Dep. 27–30, 40–43.

 Sumitomo America seems to claim that any lack of proof with respect to the loading in Rio should not affect its prima facie case, because it need establish only that the pipes were in good condition at the commencement of loading. Sumitomo argues that Lloyd, as a carrier under COGSA, is responsible for seaworthiness, and thus for the proper loading and stowage of cargo, regardless of its contractual arrangement with the shipper and, apparently, the way in which loading actually was accomplished. As a result, Sumitomo America asserts, Lloyd must bear the burden with respect to the events during loading.[14] The court cannot agree. It is true that a carrier must exercise due diligence to make the vessel seaworthy and that 46 U.S.C. § 1303(2) states that a carrier "shall properly and carefully load, handle, [and] stow ... the goods carried." Courts have suggested somewhat casually in dicta that carriers have a non-delegable duty to stow cargo. *See Nichimen Company v. M.V. Farland, supra,* 462 F.2d at 330 (no authority cited); *Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009 (2d Cir.1972). Those cases, however, did not concern a shipper freely contracting not only to pay for, but also to exercise control over, the loading and stowage process. In *Nichimen,* the consignee paid the cost of loading, but the time-charterer supervised and directed loading and stowage through a hired specialist.[15] *Demsey* involved a dispute between a vessel's time and voyage charterers.

---

13. The absence of records concerning the transport of the pipes from Pindamonhangaba to Rio de Janeiro means there is a substantial gap in plaintiff's proof of this point.

14. Sumitomo America casts some of its arguments in terms of seaworthiness and due diligence. For reasons discussed below, the court considers it more appropriate to focus on 46 U.S.C. § 1303(2) and negligence. Proof that the damage occurred while the pipes were in Lloyd's custody, however, is required even with respect to seaworthiness.

15. The allocation of payment functions alone properly is given little weight, since relatively predictable costs can be presumed to be passed on regardless of their initial placement. FILO provisions, however, do more than simply allocate responsibility for payment.

Where courts have considered the possibility of shipper control, their analyses suggest that carriers may indeed contract with shippers or consignees with respect to responsibility and control of loading and stowage. *See Atlas Assurance Co., Ltd. v. Harper, Robinson Shipping Co., supra,* 508 F.2d at 1389; *Caterpillar Overseas, S.A. v. S.S. Expeditor,* 318 F.2d 720, 724 (2d Cir.), *cert. denied,* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963). Read in context and applied to the facts of this case, then, the language of 46 U.S.C. § 1303 seems most properly interpreted not as imposing a genuine non-delegable duty to load and stow, but rather as mandating that carriers remain liable for their negligence (or the negligence of their agents) in loading and stowage as long as they in fact control those processes.

Section 1303 of COGSA is entitled "responsibilities and liabilities of carrier and ship." The title of section 1302, however, is "duties and rights of the carrier." In section 1302, there is no statement that a carrier "must stow and load the cargo." Such a statement would be meaningless, in view of the explicit provision in section 1304 that a carrier is exonerated from liability for cargo damage caused "without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier." Instead, the statute simply says that *"in relation to* the loading, handling, stowage ... of such goods" the carrier "shall be subject to the responsibilities and liabilities. *and entitled to the rights and immunities* set forth in sections 1303 and 1304 of this title" (emphasis supplied). 46 U.S.C. § 1302. Further, 46 U.S.C. § 1301 defines the term "contract of carriage" to cover bills of lading "from the moment at which such bill of lading or any similar document of title regulates the relations between a carrier and a holder of the same." Read-

ing together sections 1301–1304, one may conclude that though carriers may not limit by contract their liability for negligence in the services they provide through their employees or agents, they may, by a valid contract with the owner of the goods, limit the services they agree to provide.

Courts forced to allocate responsibility under COGSA (or the Harter Act) in cases of cargo damage during loading or discharge have focused on the elements of control, and have not spoken of non-delegable duties.[16] In *Atlas Assurance Co., Ltd. v. Harper, Robinson Shipping Co., supra,* 508 F.2d at 1389, cargo shipped under a FIO provision was damaged through negligence of the stevedores. Treating the FIO provision as a "common and commercially acceptable practice" which "did no more than place the costs and responsibility for loading and discharging on ... the shipper," the court considered the FIO term permissible under COGSA and effective to protect the carrier. "It did not relieve the [carrier] of responsibility for its own acts" and only made the carrier "not liable for what it has not done, viz., the stevedoring." In *Atlantic Banana Co. v. M.V. Calanca,* 342 F.Supp. 447, 454 (S.D.N.Y.1972), *aff'd,* 489 F.2d 752 (2d Cir.1974), where problems arose during loading, the court stressed that the carrier had "exclusive custody and control of the vessel during loading," relying on *Mackey v. United States,* 197 F.2d 241 (2d Cir.1952). In *Mackey,* a shipment of coffee was damaged while the coffee was in the process of being loaded from lighters belonging to the shippers to the vessel itself. After part of the cargo was transferred, a storm struck, capsizing a still-loaded lighter. Determining that the cargo had in fact been "delivered" to the carrier and was in its "custody and control at the time of the loss and damage," the district court in *Mackey* found that 46 U.S.C. § 1303(2) should apply and held the carrier liable for failure to properly handle

---

**16.** As noted earlier, *Nichimen Company v. M.V. Farland, supra,* does speak of non-delegable duties. The damage at issue in *Nichimen,* however, occurred not during loading or discharge, but rather during the voyage, when the vessel encountered rough seas and the cargo shifted.

and care for the cargo. *Id.* at 242. Upon appeal, the Second Circuit affirmed, adopting the lower court's analysis with respect to delivery and custody.

> The vessel's supercargo directed where the lighters were to be placed and their lines were made fast by the vessel's longshoremen. When the lighters were moored alongside according to the instructions issued by the ship and loading was commenced, the cargo was accepted for transportation and was thereafter subject to the ship's control *since the ship not only determined where and when the loading would take place and the speed of the operation but also was in sole control of the lighters* which after the storm came up could not have returned to shore.

*Id.* at 243 (emphasis supplied). Where damage has occurred to cargo in lighters under the control of the shipper rather than the carrier, courts have exempted the carrier from liability on the ground that the cargo was never "delivered" to the carrier. *See, e.g., E.T. Barwick Mills, Inc. v. Hellenic Lines Ltd.,* 331 F.Supp. 161 (S.D.Ga. 1971), *aff'd,* 472 F.2d 1406 (5th Cir.1973) (carrier had issued clean bills of lading). Where damage has occurred during discharge and delivery activities over which the carrier had no control, courts have exempted the carrier on the ground that the cargo was "delivered" at the time control was surrendered. *See, e.g., All-Commodities Supplies Co., Ltd. v. M.V. Acritas,* 702 F.2d 1260 (5th Cir.1983) (unloading was "under the exclusive control" of Nigerian Port Authority; carrier had "neither choice nor control over the stevedores"); *cf. Metalimport of Romania v. S.S. Italia, supra* (where discharge operations are controlled by government rather than shipper, consignee, or carrier, carrier has a defense under 46 U.S.C. § 1304(2)(q)).

In *Caterpillar Overseas, S.A. v. S.S. Expeditor, supra* (under Harter Act), the Second Circuit addressed the question of contractual arrangements with respect to control of loading and discharge. There, the court held a carrier liable for damage to cargo on a lighter, because the carrier was in control of the cargo—an agent of the owner of the vessel chose and hired the lighter and employed the stevedores, all without consultation with the consignee. The court noted, however, that "in a case where the consignee has his own lighter and stevedores, the Harter Act would not prohibit a properly drafted agreement from providing for delivery of goods by discharge onto the consignee's lighters." *Id.* at 724. The court in *Central Trading Corp. v. M.V. Dong Myung,* 361 F.Supp. 302 (S.D.N.Y.1973) expanded upon this suggestion.

> [The] Harter Act does not outlaw a contract which clearly provides an alternative *place of delivery* (thus terminating the carrier's liability upon delivery to that place). [Rather,] it renders ineffective any attempt to limit liability by providing a specific *method* of delivery, and purporting to relieve the carrier of responsibility if that method be followed.

*Id.* at 304 (by contract, shipper or consignee paid for and assumed risk for discharge, but vessel owner selected stevedore and supervised discharge; vessel owner not exempted from liability); *cf. Hoegh Lines v. Green Truck Sales, Inc.,* 298 F.2d 240, 242–243 (9th Cir.), *cert. denied,* 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962) (citing *Mackey* ) (carrier responsible under COGSA for cargo in process of being unloaded, despite fact that shippers hired lighters, since hire of lighters was at vessel's suggestion, vessel itself hired the necessary floating derrick, and the work was done by agents of the vessel).

Consideration of the policies underlying COGSA bolsters the court's conclusion that the burden is on Sumitomo America to establish the good order of the pipes at the completion of loading. The statute does away with strict liability of carriers for cargo damage, and restricts the scope of a carrier's vicarious liability for acts of its agents and employees. *See* 46 U.S.C.

§§ 1303(1), (2); 1304(1), (2)(a), (2)(q).[17] Under COGSA, freedom from fault on the part of the carrier and its agents is a complete defense. In addition, COGSA provides other defenses which, if proven, exonerate the carrier unless the plaintiff comes forward and proves that negligence on the part of the carrier also contributed to the damage. *See, e.g.,* 46 U.S.C. § 1304(2)(i). If negligence is to be the basis for liability, it is hard to see how a plaintiff can establish a prima facie case for recovery for cargo damage without proving, at a minimum, that the cargo in question was in good condition at the time it first became possible for the carrier to act negligently with respect to the cargo, *i.e.,* at the time the carrier took custody of the cargo, issued the bill of lading, and commenced its duties under the contract.

### B. *The Condition of the Cargo at Discharge*

At the time the pipes were discharged in Houston, twelve exceptions were taken for apparent damage to the cargo noted by the discharging stevedores. Most of the notations reflect damage seen "in stow" by the stevedores working the holds of the ship prior to the actual discharge operation.[18] *See* exs. C–12, C–16, C–17; Blackburn Dep. 38–40. The vast majority of the damage, however, was not documented until some time after discharge.

▪ Although it is conceivable that Lloyd received some informal notice soon after discharge of problems with the quantity of pipes received, mislabeling of the pipes, and the failure to segregate the pipes by bills of lading, Sumitomo America did not notify Lloyd or its agent of the claimed damage at issue here within the three day period specified by 46 U.S.C. § 1303(6). *See, e.g.,* exs. A–24, B–28. As a result, there is a presumption that the goods were delivered in the condition described in the bills of lading.

▪ Sumitomo America has introduced some proof tending to show that the damage at issue here was more likely to have occurred sometime prior to completion of discharge at Houston than after that time. There are inherent risks in discharging a cargo of such random length pipes, particularly when they are stowed in two courses. Rogers Dep. 27–30, 43; Wall Dep. 48; Blackburn Dep. 41–44. In addition, it seems there were no recorded mishaps with the pipes after discharge, *i.e.,* during their transport from the M/V Sie Kim in Houston to Gulf at Breen Road and during storage at Gulf prior to inspection. Although the absence of recorded mishaps alone is not persuasive because there are no records whatsoever for some of the time involved, Sumitomo America has provided some corroborative evidence through testimony suggesting that the kind of damage seen in the pipes on B/L 602 and 603 would not occur from minor unrecorded incidents in truck transport and storage.[19] Thus, the plaintiff arguably has rebutted the presumption arising under 46 U.S.C. § 1303(6) and shown that the pipes covered by B/L

**17.** The provisions of 46 U.S.C. § 1304 specify that due diligence and lack of negligence are defenses which apply to actions under COGSA. Further, 46 U.S.C. § 1303 itself describes the section prohibiting contractual waivers as one relating to "limitation of liability *for negligence*" (emphasis supplied).

**18.** With respect to the damage covered by the stevedores' notations of damage, Sumitomo America may well have a prima facie case. Nevertheless, Lloyd has defenses to liability even as to those pipes, since Lloyd has established that "acts of the shipper" at the time of

loading contributed to the damage and it has not been established that negligent acts on the part of Lloyd or the discharging stevedores also caused the damage at issue.

**19.** *See* Hopkins Dep. 151, 165. The testimony is weak, however. It seems to refer to "bent ends," damage which is more severe than much of the damage at issue. Further, the witness's experience is with other, larger, forms of pipe. Other witnesses testified that damage sufficient to cause "stuck protectors" could occur during truck transport. Ferreira Dep. 27; Nagy Dep. 38.

602 and 603 were damaged prior to the time discharge from the M/V Sie Kim was completed, even though some of the damage was not documented until late February, 1982.

Despite this showing, the court must conclude that the plaintiff has not made out a prima facie case under COGSA. Even if Sumitomo America is considered to have established that the pipes at issue were damaged by the time discharge from the M/V Sie Kim was completed in Houston, Sumitomo has failed to prove that the pipes were undamaged at the time the pipes were placed in Lloyd's custody by Sumitomo Brazil in Rio. Sumitomo has also failed to provide convincing evidence that the nature of the damage indicates that it occurred while the pipes were in Lloyd's custody.[20] Thus, those provisions of COGSA which shift to the carrier the burden of proof are inapplicable and there is no justification for finding Lloyd liable.

## IV. *Lloyd's Defenses*

■ Even if one assumes that COGSA permits a consignee of a FILO shipment to establish a prima facie case for recovery of damages from a carrier by showing that goods were undamaged prior to commencement of loading and were damaged at the completion of discharge (despite the fact that it was the shipper that controlled the loading), Lloyd has a defense to liability.[21] Thus, the plaintiff cannot recover even if the court adopts the approach rejected on pages 836–840 *supra*.

The witnesses in this case were unable to testify that the type of damage in question is more likely to have occurred at discharge than at loading. Several indicated that loading is more risky than discharge.

There is persuasive evidence that at least some damage occurred at the time of loading.[22] Further, much of the risk of damage at discharge can be attributed to the combination of the nature of the pipes (*i.e.*, random length) and the nature of the stow accomplished on behalf of the shippers (*i.e.*, loose, with two courses and irregular gaps or overlap). Rogers Dep. 18–23, 27–30, 53–55; Blackburn Dep. 37–43; Hopkins Dep. 32, 131–33, 141. Under 46 U.S.C. § 1304, these facts exonerate Lloyd.

### A. *The Claim for Unseaworthiness*

■ Under COGSA, an ocean carrier has a duty to exercise due diligence to ensure that a vessel is seaworthy. 46 U.S.C. § 1303(1). The test for seaworthiness is "whether the vessel is reasonably fit to carry the cargo she has undertaken to transport." *Atlantic Banana Co. v. M.V. Calanca, supra*, 342 F.Supp. at 452. Stowage can influence seaworthiness. *See, e.g., Blanchard Lumber Co. v. S.S. Anthony II*, 259 F.Supp. 857 (S.D.N.Y.1966). Even under a FILO shipment, the Master and carrier retain the power to veto use of any stowage techniques which may endanger the ship or other cargo. *See Nichimen Company v. M.V. Farland, supra*, 462 F.2d at 332. The Master and carrier must exercise that veto when due care requires. *See generally id.* It does not follow, however, that all failures to "properly and carefully stow" cargo raise issues of seaworthiness.[23] *See, e.g., Demsey & Associates v. S.S. Sea Star, supra; Nichimen Company v. M.V. Farland, supra*, 462 F.2d at 332. Further, it is clear that there can be no recovery of damages on a claim of unseaworthiness absent proof of causation. *See, e.g., Nichimen Company v. M.V. Farland, supra; Atlantic Banana v. M.V. Calanca, supra.*

---

**20.** *See* n. 19, *supra*.

**21.** In view of its decision here, the court need not determine whether the plaintiff is the real party in interest. *See generally Gradmann & Holler GmbH v. Continental Lines, S.A., supra.*

**22.** *See* discussion *supra* at 5, 7, 18–19.

**23.** If the concept of using due diligence to ensure seaworthiness included all aspects of improper stowage or loading, there would be no sense in COGSA specifying separately that a carrier shall "properly and carefully load, handle [and] stow...." *Compare* 46 U.S.C. §§ 1303(1) and 1303(2).

■ The records of the voyage of the M/V Sie Kim to Houston are in evidence. There was no unusually rough weather. Weather such as that recorded for the voyage is unlikely to have caused any shift in stow or any damage to the pipe. Wall Dep. 86–88; Butterworth Dep. 45–48. Comparison of the photographs taken of the cargo after loading in Rio and in Houston prior to discharge indicates that there was no significant shift in stow during transport. Ex. 1; C–8. Since Sumitomo America has offered no persuasive evidence indicating that there was in fact a shift in stow [24], the court must conclude that the stow, although arguably improper and potentially damaging had the Sie Kim encountered rough weather (see Rogers Dep. 22, 42, 53; Wall Dep. 37–38, 42–44), in no way contributed to the damage here. Butterworth Dep. 30–31, 45–51.

As noted earlier, the court is not persuaded that the nature of the stow of the Santos cargo in any way caused the damage to the Confab cargo ultimately loaded. The Confab stow was level; there is no convincing evidence of settling or shifting in the Confab cargo after the completion of loading or during the voyage. Nothing corroborates the testimony of Dos Santos that the Santos cargo settled during loading. Indeed, given the other testimony of Dos Santos, the court expects that had there been such settling, Dos Santos would have had any affected Confab pipes removed from the vessel. While it is true that the stow of the Santos cargo slowed the loading in Rio and resulted in short-loading of Confab pipe, those facts are irrelevant to Sumitomo's claim here.

Because the damages at issue have not been causally linked to any theoretical unseaworthiness in the stow, Sumitomo America cannot recover for unseaworthiness. See 46 U.S.C. § 1304(1).

## B. The Claim for Negligence

### 1. Negligence during Loading.

■ Under the terms of B/L 602 and 603, the obligation to load and stow was placed on the shipper, Sumitomo Brazil, and it was the shipper who in fact arranged and supervised the stowage. As a result of the FILO and C & F provisions, until loading was completed title to the pipes, and the associated risk, expense, and control remained with the owner, Sumitomo Brazil, vis-a-vis both the carrier, Lloyd, and the consignee, Sumitomo America. Any negligence causing damage during loading was that of Sumitomo Brazil and is not attributable to Lloyd under 46 U.S.C. § 1304(2)(q). In addition, even if there was no negligence in loading, any loading damage would be the result of "acts or omissions of the shipper," or perhaps an "inherent vice or quality" of the pipes, and Lloyd would be protected by the provisions of 46 U.S.C. § 1304(2)(i).

### 2. Negligence at Discharge.

■ While the evidence on record suggests that at least a small part of the damage may have occurred during discharge, there is considerable evidence that the risk was one attributable to the nature of the cargo and the nature of the stow chosen and accomplished by Sumitomo Brazil, rather than to negligence on the part of Lloyd or its hired stevedores.[25] Lloyd thus has a defense under 46 U.S.C. § 1304(2)(i), (2)(m), unless it is established that negligence attributable to Lloyd also contributed to the damage. Lloyd has presented evidence that the techniques employed at discharge were reasonable, given the circumstances. Hopkins Dep. 32–35, 138–142; Blackburn Dep. 24–47; Rogers Dep. 13–40, 50–55; Wall Dep. 48–50; Butterworth Dep. 60–62. There is little contradictory evi-

---

**24.** The court interpets the testimony that the pipes were "mixed up," "piled in … like toothpicks," and looked "messed up" as referring to the irregular nature of the gap in the two-course stow, the lack of dunnage between the layers of pipe, and the lack of segregation of the pipes by bills of lading. See discussion supra at 8, 9, 27–29; Hopkins Dep. 131, 133.

**25.** See discussion supra at 839–840.

dence.[26] Since Lloyd did not create the circumstance of random-length cargo in a two-course undifferentiated stow that, in part, necessitated the use of those techniques, it cannot be charged with negligence for their proper use, even if that use was a but-for cause of the damage. Accordingly, Lloyd has a defense under 46 U.S.C. § 1304(2)(i) and (2)(q), and cannot be held liable for any damage during discharge.

3. Negligence during the Voyage.

As discussed earlier, the evidence on record strongly suggests that no action of Lloyd, its employees, or its agents during the voyage in fact caused the damage at issue here. Absent proof of causation, there can be no recovery for any theoretically ill-advised behavior.

### Conclusion

For the foregoing reasons, the court finds for the defendant Lloyd. The complaint is dismissed.

So Ordered.

---

**26.** The use of hooks in connection with discharge has been satisfactorily explained. Further, pipe hooks were used at loading. Wall Dep. 105. The court does not accept the suggestion that the pipes were discharged in a hurried manner, with an excessive number of pipes per draft. The persuasive evidence is that the discharge was quite slow, ex. C–8, and that the number of pipes per draft was reasonable. Ex. C–8 ("small lifts"); Hopkins Dep. 34; Rogers Dep. 37. References to ten pipes per draft appear in the context of hypothetical questions and do not constitute evidence of the manner in which the discharge was actually accomplished. *See, e.g.,* Rogers Dep. 37–38; Butterworth Dep. 61–62 (relying on Rogers 37–38). Further, there is no evidence that the number of pipes per sling, even if "risky" in theory, resulted in any damage.