ATLANTIC MUTUAL INSURANCE COMPANY, INC., as subrogee of Pepsico, Inc., Plaintiff–Appellant,

v.

CSX LINES, L.L.C., CSX EXPEDITION, her engines, boilers, etc., and Hyundai Mipo Dockyard Co. Ltd., Defendants–Appellees.

Docket No. 04–6670–CV.

United States Court of Appeals, Second Circuit.

Argued: Aug. 29, 2005.

Decided: Dec. 27, 2005.

Edward C. Radzik, Donovan Parry McDermott & Radzik (Carolyn E. Meers, on the brief), New York, N.Y., for Plaintiff–Appellant.

Chester D. Hooper, Holland & Knight (James H. Power, on the brief), New York, N.Y., for Defendants–Appellees.

Before: WALKER, Chief Judge, CALABRESI and KATZMANN, Circuit Judges.

CALABRESI, Circuit Judge.

This is a case about soda pop and seawater. In mid-August 2000, the CSX Expedition ("Expedition"), a ship bound for Port Elizabeth, New Jersey, docked in San Juan, Puerto Rico to load additional freight. The new cargo included three forty-foot steel enclosures ("the containers") in which a large volume of phosphoric acid solution—a concentrate from which caffeine-free Pepsi is produced—had been stored for shipment. During the journey, one of the containers was flooded under ten feet of ballast water, while the other two containers were partly submerged. After the Expedition reached Port Elizabeth, the consignee, Pepsi Cola Company ("Pepsi"), examined the cargo and accepted the two containers that had only been partially immersed. But, insisting that the integrity of its contents had been compromised, Pepsi rejected the container that had been fully submerged. CSX Lines, L.L.C. ("CSX"), which owned and operated the Expedition, retained a cargo surveyor who independently inspected the cargo and disputed Pepsi's assessment. Despite the disagreement, Pepsi disposed of the contents of the fully-submerged container in late September.

As subrogee of Pepsi, Appellant Atlantic Mutual Insurance Company, Inc. ("Atlantic Mutual"), subsequently brought suit against the Expedition, CSX, and Hyundai Mipo Dockyard Co., Inc.,[1] alleging, *inter alia*, negligence and breach of contract. In due course, Appellees moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), and Atlantic Mutual subsequently filed a cross-motion seeking summary judgment as well. The

---

1. The flooding was apparently the result of defects in the Expedition's ballast system, which had undergone repairs and modifications on June 10, 2000. Hyundai had, under contract with CSX, performed these repairs. Nonetheless, Hyundai was dismissed as a defendant for want of personal jurisdiction, and therefore is no longer a party in this action. *See Atlantic Mut. Ins. Co., Inc. v. CSX EXPEDITION,* No. 00 Civ. 7668(LMM), 2002 WL 202195 (S.D.N.Y. Feb.7, 2002) (*"Atlantic Mutual I"*).

district court (McKenna, *J.*) granted summary judgment to Appellees on the grounds that Atlantic Mutual had failed to submit sufficient evidence to establish a prima facie case of liability under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300 *et seq* .. Atlantic Mutual appeals.

## BACKGROUND

On August 21, 2000, Concentrate Manufacturing Operations Pepsico, P.R., Inc. shipped three containers, numbered SEAU 8545382, SEAU 8267018, and MSKU 6056553, to Port Elizabeth, New Jersey. They were stowed in cargo hold No. 7. Each of them contained hundreds of five-gallon plastic pails of phosphoric acid solution from which millions of servings of soda, *e.g.*, caffeine-free Pepsi, were to be produced.

At 1:35 a.m. on August 22, 2000 (three hours after the Expedition had left port), ballast tank No. 8 was intentionally filled with seawater to steady the vessel. Later that morning, at approximately 10:30 a.m., crew members discovered that ballast water had flowed through a starboard opening in tank No. 8 and flooded cargo hold No. 7, where Pepsi's three steel containers had been placed. By the time the crew detected the flooding, the hold had been filled with roughly ten feet of seawater. Although two of Pepsi's three containers, SEAU 8545382 and SEAU 8267018, were only partially submerged, the third container, MSKU 6056553, had been stowed on the bottom tier of the flooded chamber, and, as a result, had been fully submerged for about nine hours. That container held 720 five-gallon pails of Pepsi Free concentrate and was shipped pursuant to a bill of lading that expressly incorporated, and was therefore controlled by, the Carriage

of Goods by Sea Act, 46 U.S.C. app. § 1300 *et seq* .. [2]

According to Atlantic Mutual, the fully-submerged container, by virtue of being immersed in ten feet of ballast water for a prolonged period of time, had been "severely distorted and deformed and was split on the left side panel near the rear of the container." Shortly after the Expedition docked in Port Elizabeth on August 24, 2000, Pepsi—the party insured by Atlantic Mutual and the consignee of the shipment—inspected the containers. Although Pepsi decided to accept the contents of the two containers that had only been partly submerged, it promptly rejected the cargo shipped in container MSKU 6056553, stating that "the entire container and contents had been fully submerged and the container itself badly damaged."

On August 30, 2000, Lew Silver, Senior Manager of Quality for Pepsi, examined the contents of the submerged container on Pepsi's behalf and provided his assessment of the condition of the cargo. He found that the "damage to the container seemed to be consistent with the forces of external water pressure substantial enough to distort and tear the steel." Silver observed that water had penetrated the shrink-wrap surrounding the pails, that the top and sides of these plastic drums, made of high density polyethylene, were "completely wet," and that most of the metal caps exhibited varying degrees of rust as a result. In his report, he added: "I observed that the pallets along the left side of the container, which was bowed and creased inward, suffered some crushing damage. Since the pails are made of plastic, any pressure on them from crushing would have caused the spout to deform and the seal around the metal

---

**2.** The only noteworthy departure from prevailing COGSA rules was that the bill of lading governing the shipment of MSKU 6056553 voluntarily increased the package value limit above the default standard of $500.00 set by COGSA.

cap to become displaced." On the basis of these observations, and because neither the pails nor the caps were, in Silver's view, designed to be submerged in ballast water during transit, Silver concluded that "seawater may have entered into the pails and adulterated the concentrate within." Accordingly, he declared the concentrate unfit for use.[3] In so doing, he emphasized that the cargo was meant to produce millions of servings of soda destined for human consumption.

Silver's appraisal of the damage to the cargo did not go uncontested. CSX dispatched cargo surveyor, Richard T. Allen, to assess what, if any, damage the container and its contents had suffered as a result of the flooding. Allen examined the shipment on August 30, 2000 at a warehouse in Edison, New Jersey to which it had been transported. According to Allen's deposition, the cargo "appeared to be in the same stow configuration as it had been at loading." Although he conceded that there were indications that the external surface of the containers had been exposed to ballast water, Allen contended that the available evidence did not demonstrate that the pails containing the concentrate had been breached:

> Examination of the pails revealed that they had been submerged in seawater. There was visible evidence of water ac-

cumulation in the folds of the plastic wrap as well as water on the tops of the individuals pails. The metal Tri–Sure® tab seals showed varying degrees of rust ranging from none to heavy in some areas. The presence of rust on some of the sealing caps did not, in my opinion, indicate that the integrity of the seals had been compromised. Upon inspection, the rust was clearly cosmetic.

On the same day as his inspections, Allen also asked for an opportunity to examine the concentrate directly. According to Allen, Pepsi refused the request (though Pepsi maintains that Allen would only have been barred from taking a sample of Pepsi Free concentrate away from the site).[4] Concurrently with the refusal, Allen was informed that all 720 pails would be destroyed since "the contents of the pails had been contaminated because the pails had been submerged in seawater." Atlantic Mutual confirmed this intention in a September 19, 2000 letter to Allen, explaining that the concentrate would "probably be destroyed early next week before the lids start popping off." The letter continued: "If this occurs we will have to have hazmat dispose of it at an expensive cost." In addition, Atlantic Mutual offered to meet Allen at the warehouse if he wanted another opportunity to examine the cargo.[5] Allen immediately responded to Atlantic Mu-

---

**3.** Around the same time, Silver also sent a sample of concentrate solution from the submerged pails back to Puerto Rico for "specific gravity" testing. This test, which Atlantic Mutual maintains is "very precise" and is "the only test capable of detecting the dilution by water of the Pepsi concentrate cargo," indicated a contamination of 85 ml of water in a 5–gallon pail. Silver maintains that the result of the specific gravity test did not drive his decision, and only corroborated the conclusion he had drawn on the basis of his visual inspection of the containers.

**4.** Concerned ostensibly with confidentiality, Pepsi claimed that it restricted access to the

concentrate "in order to protect its well-guarded formula and control practices." *See* Pl. Count. 56.1 Statement ¶ 43.

**5.** Attached to this letter was a communication from Silver, who defended and elaborated on his finding that the concentrate was not fit for use: "Although there was no spillage, I did observe water on the tops of the palletized (and stretch wrapped) pails. There is a clear indication that the closure of each container had been exposed to water. These closures are not designed to be watertight. For this reason, I conclude that water may have entered the container and adulterated the concentrate."

tual's September 19th letter, explaining that there had been "no demonstration of contamination to the product other then [sic] wetting of the exterior of the pails." He insisted that Atlantic Mutual agree to a joint examination of the shipment and cautioned that "allowing the shipment to remain as is will in all probability result in progressive rusting of the metal caps which could have an effect on the contents."

Two days later, Allen returned to conduct further examination of the pails' exterior and observed "considerable progressive rust damage." He was allegedly again prohibited from removing the phosphoric acid solution from the sealed containers, but he examined the Tri–Sure® tab seals on the pails and "found them to be tight with no evidence of movement or loosening and no evidence that the seal had been compromised." Based on this second examination, Allen reiterated (in a letter dated September 22, 2000) that he could not concur with Pepsi's rejection of the cargo or with its decision to destroy 720 pails of Pepsi Free concentrate. In

this letter, Allen yet again asked for samples from the putatively contaminated pails "for further examination and testing if . . . necessary." [6] The request went unanswered, and the concentrate was burned at the end of September. By that time, Pepsi had submitted a claim to CSX for the invoice price of the 720 pails of Pepsi concentrate, $984,600, and for the costs of shipping and destroying the ostensibly unusable cargo.[7]

Subrogating to Pepsi's claim, Atlantic Mutual brought suit against Appellees for, *inter alia,* negligence and breach of contract. Appellees moved for summary judgment under Fed. R. Civ. Pro. 56(c), and Atlantic Mutual entered its cross-motion for summary judgment. The district court (McKenna, *J.*) granted Appellees' motion and denied Atlantic Mutual's cross-motion. *See Atlantic Mut. Ins. Co. v. CSX Expedition,* No. 00 Civ. 7668(LMM), 2004 WL 1746712 (S.D.N.Y. Aug.3, 2004) ("*Atlantic Mutual II* "). The court concluded that Atlantic Mutual had not satisfied its initial COGSA burden of establishing a

6. In February 2003, long after the contested concentrate had been destroyed, CSX retained Kenneth T. Allen to conduct a simulation on sample pails provided by Pepsi at Appellees' request. The pails, which had been sealed with a Tri–Sure® tab using the same pneumatic sealing tool and procedure employed by Pepsi, were placed for twenty-four hours in a pressurized tank that purported to simulate submersion in fifteen feet of water. When removed and tested, no leakage was found, although water had "penetrated the gap between the crimped metal cap and the plastic seal on the lip of the . . . pail's spout." Atlantic Mutual questioned the accuracy of the test on the ground that it failed to take account of the dynamic forces at sea.

Earlier tests had been performed in March 2001 by a different firm, TEN–E Packaging Services, on similar pails and sealing tabs. According to TEN–E's March 6, 2001 report, the pails passed the "leak proof test" and the "internal hydrostatic pressure test," which entailed subjecting the pails to pressurized

conditions for between five and thirty minutes. In addition to noting the substantially shorter exposure time in the TEN–E test, Atlantic Mutual challenged the TEN–E assessment on the ground that the patented seals were meant only "to ensure that the contents of the pails [did] not leak *out.* The U.S. Patent for the caps does not state or guarantee that the caps create a watertight seal that would preclude water from *entering* the pails if fully submerged . . . . The Tri–Sure Tabs were selected by Pepsi for their tamper-[resistant] characteristics, not to protect cargo from submersion in ballast water."

7. The plastic pails contained in the two partially-immersed steel chambers, SEAU 854538 and SEAU 821511, held other types of Pepsi concentrate. These pails were washed or wiped clean, repackaged where necessary, and sent on to their intended destinations. As part of a consent order, CSX agreed that it was liable for clean-up and repackaging costs, which amounted to $68,430.

prima facie case of liability. Specifically, the court found that Atlantic Mutual's uncontested evidence that the pails had been "fully submerged in seawater and that the Tri–Sure® tab seals on the pails were rusted in varying degrees" did not sufficiently establish a prima facie case of liability. *Atlantic Mutual II*, 2004 WL 1746712, at *6. In the district court's view, the fear of contamination was premised only on "a specific gravity test conducted on one sample from one pail outside the presence of the defendants under unspecified conditions." *Id.* at *7.

Apart from the court's misgivings about the validity of the specific gravity test, the court decided that it would be prejudicial to consider the results of this test since Pepsi had precluded Appellees from conducting an independent analysis of the contents of the 720 pails, purportedly to protect its " 'secret and well-guarded formula and control practices.' " *Id.* (quoting Pl. Count. 56.1 Statement ¶ 43). Having excluded the results of the specific gravity test, the court held that Atlantic Mutual had failed to demonstrate, as COGSA requires for a prima facie case of liability, that its cargo was "damaged upon delivery." As a consequence, the court dismissed Atlantic Mutual's claims and entered summary judgment in favor of Appellees.

## DISCUSSION

We review *de novo* a district court's grant of summary judgment. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004). Summary judgment is only appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford*, 391 F.3d at 83 (internal citations omitted). This standard applies equally to cases, like the instant one, in which both parties applied for summary judgment, and in which the district court granted one motion and denied the other. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.2001).

To recover against a carrier for damage to goods shipped pursuant to a bill of lading governed by COGSA, a plaintiff " 'bears the initial burden of proving both delivery of goods to the carrier . . . in good condition, and outturn by the carrier . . . in damaged condition.' " *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98 (2d Cir.1998) (quoting *Vana Trading Co. v. S.S. "Mette Skou,"* 556 F.2d 100, 104 (2d Cir.1977)). We have held that "the issuance of a clean bill of lading creates a presumption of delivery in good condition favorable to the plaintiff." *Transatlantic Marine Claims Agency*, 137 F.3d at 98. We have also stressed that the "plaintiff has the burden, which remains with it throughout the case, of proving that 'the goods were damaged while in the carrier's custody.' " *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351–52 (2d Cir.1981) (quoting *Pan–American Hide Co. v. Nippon Yusen (Kabushiki) Kaisha*, 13 F.2d 871, 871 (S.D.N.Y.1921) (L.Hand, *J.*)). It is only once the plaintiff establishes a prima facie case that the burden shifts to the defendant to prove that one of the statutory COGSA exceptions to liability applies. *See* 46 U.S.C.app. § 1304(2).

In the case before us, Appellees do not disagree that the cargo was entrusted to

them in good condition.[8] What is disputed is what must be proven to establish damages for the purposes of prima facie liability under COGSA, and, hence, whether the concentrate was damaged upon delivery. With respect to these issues, the district court concluded: "[B]ecause ... the specific gravity test conducted by Pepsi is the *only* evidence that could support plaintiff's contention that the cargo was damaged upon delivery ... plaintiff has not established a *prima facie* case for liability." *Atlantic Mutual II,* 2004 WL 1746712, at *8 (emphasis added).

On appeal, Appellant argues: (1) the district court erred in excluding the results of the specific gravity test, (2) the specific gravity test, along with evidence of damage to the exterior of the steel container and plastic pails, was enough to establish, at summary judgment, that the cargo was damaged upon delivery, and (3) the loss of the soda concentrate's market value, due—as it was—solely to its immersion, was sufficient to demonstrate that Appellant's cargo was damaged upon delivery. Because we hold that Atlantic Mutual's evidence of loss of market value establishes, by itself, adequate proof of damage to set out a prima facie case of liability under COGSA, we need not decide whether the district court wrongly excluded the specific gravity test or whether, with or without the results of the challenged test, there was sufficient circumstantial evidence of contamination ·to survive summary judgment. Accordingly, we vacate the district court's grant of summary judgment, and remand the case for further proceedings.

■ In order to satisfy the "damage upon delivery" condition of prima facie liability for a COGSA cause of action, *i.e.,* to prove that "the goods were damaged while in the carrier's custody," *Caemint Food,*

647 F.2d at 351 (internal quotation marks and citation omitted), a plaintiff must present evidence (a) that the cargo was damaged, and (b) that the damage occurred while the cargo was under the carrier's control and not because of "any inherent vice of the cargo." *Siderius v. M.V. "Amilla,"* 880 F.2d 662, 664 (2d Cir.1989) (citation omitted). In the case before us, the second prong—which focuses on when the cargo was damaged, and consequently, whether the damages may be properly attributed to the carrier's alleged misconduct—is not in serious dispute. In fact, after CSX initially asserted that it had been diligent but nonetheless failed to detect the latent defect in the bilge system that ostensibly caused the flooding of hold No. 7, CSX filed a revised Rule 56.1 statement in which it acknowledged that "due diligence was not exercised," thereby admitting fault and leaving open only the question of whether Atlantic Mutual's cargo suffered damage as a result of Appellees' negligence. *Atlantic Mutual II,* 2004 WL 1746712, at *1.

With respect, instead, to this prong—whether the Pepsi Free concentrate in question·was actually damaged—Appellees contend (a) that Atlantic Mutual has failed to proffer sufficient evidence to demonstrate that the phosphoric acid solution contained in the sealed pails was contaminated by ballast water, and (b) that Atlantic Mutual's repeated refusals to allow Appellees to inspect and directly test the concentrate for themselves precluded a fair appraisal of the supposed damages. Because there is an independent ground on which this appeal must be decided in favor of Appellant, we need not, however, address either of these contentions by Appellees.

---

**8.** *See Atlantic Mutual II,* 2004 WL 1746712, at *6 ("[I]t is undisputed that the 720 five-gallon pails of Pepsi Free Concentrate solution ... were delivered to defendants in Puerto Rico in good condition.").

■ It is well-settled that the loss in market value of a plaintiff's cargo is the presumptive measure of damages in a suit brought under COGSA. *See Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli,* 814 F.2d 115, 118 (2d Cir.1987) ("Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive."); *see also Jessica Howard Ltd. v. Norfolk Southern Ry. Co.,* 316 F.3d 165, 169 (2d Cir.2003) ("The Carriage of Goods by Sea Act caps a carrier's liability at the amount of damage actually sustained, a phrase that courts have interpreted ordinarily to measure damages at the market price of the cargo at the place of destination ... on the date when it should have arrived." (internal quotation marks and citations omitted)).[9]

Since loss in market value is the ordinary yardstick of damages in a COGSA suit, we believe that evidence of a significantly discounted market value must also suffice to show damage to a plaintiff's cargo for the purposes of establishing prima facie COGSA liability. To hold otherwise would produce a bizarre set of rules: Evidence of market loss would typically be highly relevant (at the *damages* stage of a suit) on the issue of how much compensation a plaintiff should receive. But (at the *preliminary* stage), it would be insufficient to establish even a prima facie case on the existence *vel non* of damage. We have found nothing either in our circuit law that requires such a counterintuitive result, or in the language or history of the COGSA that suggests that market value is any less appropriate an indicium of damages at the prima facie stage than it is at a later stage of the suit.

■ We, therefore, hold that evidence of more than trivial loss in market value [10] —as measured by the difference between (a) the market value of the goods in question in the condition in which they should have arrived at their destination, and (b) the market value of the goods in the condition in which they actually arrived—is sufficient to prove that a plaintiff's cargo was damaged upon delivery. And, in itself, such evidence meets the "damages" requirement for a prima facie case of liability under COGSA.[11]

9. Though presumptive, market value is not the *exclusive* measure of damages. *See Thyssen, Inc. v. S/S Eurounity,* 21 F.3d 533, 540 (2d Cir.1994) ("[T]he market discount theory is not the exclusive measure of damages and need not be applied if circumstances suggest a more appropriate alternative." (internal quotation marks and citations omitted)); *Kanematsu–Gosho Ltd.,* 814 F.2d at 118–119 ("The computation of damages based upon fair market value is not the only method of measurement.... 'The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable.'" (quoting *Illinois Cent. R.R. v. Crail,* 281 U.S. 57, 64–65, 50 S.Ct. 180, 74 L.Ed. 699 (1930))).

10. This rule permits a *de minimis* exception, which, though plainly inapplicable to our case because Appellant has submitted evidence of substantial market value decline, would preclude recovery if a COGSA plaintiff could not show that his or her cargo had suffered more than a minimal loss of market value. *Cf. Castle & Cooke Foods v. S.S. Tobias Maersk,* 491 F.Supp. 1305, 1308 (S.D.N.Y.1980) (in a COGSA suit, the district court found defendants liable for damages "[s]ince the court [had] conclude[d] that the damage ... was not de minimis.").

11. Evidence of decreased market value does not, of course, displace the need to show the other elements of COGSA liability, *e.g.,* that the cargo was damaged while in the carrier's custody, that the apparent damage was attributable to the carrier's alleged negligence, etc. *See generally Transatlantic Marine Claims Agency,* 137 F.3d at 98.

Atlantic Mutual has submitted evidence that the 720 pails of Pepsi Free concentrate shipped in the fully-submerged container retained no market value because the concentrate could not, as a practical matter, be sold. Thus, in his deposition, Silver (Pepsi's Senior Manager of Quality) explained that even if the results of the specific gravity test had suggested that seawater had not infiltrated the concentrate, he nonetheless would have been unable to guarantee the integrity of the product to Pepsi's bottlers and consumers, and without such a guarantee, the product would not have been bought by bottlers.[12] Bottlers, concededly connected with Pepsi, seconded that conclusion.[13]

Nor is this testimony fanciful. After all, the Pepsi Free concentrate was ultimately destined for human consumption. As Atlantic Mutual avers, the mere possibility of contamination arguably rendered the Pepsi Free concentrate "adulterated" under federal law, see 21 U.S.C. § 342(a)(4) (stating that "food shall be deemed adulterated ... if it has been prepared, packed, or held under unsanitary conditions whereby it *may* have become contaminated with filth, or whereby it *may* have been rendered injurious to health" (emphasis added)), and such potentially adulterated food may not be given out for human consumption, see *United States v. Gel Spice Co., Inc.,* 773 F.2d 427, 429 (2d Cir.1985) (finding that federal law "prohibits distribution of 'adulterated' food, which is defined, in part, as food which *may* have become contaminated with filth, *regardless* of whether filth is *actually* found in the food itself" and explaining that violators could be subject to civil seizure and criminal prosecution (emphasis added)). Atlantic Mutual has submitted uncontroverted evidence that the pails containing Pepsi Free concentrate, which were not designed to be watertight, were submerged in sea water, that they were subjected to pressure which might caused their caps to loosen, and that the tab caps on the pails were rusted. Because this combination of factors creates a possibility that the contents of the pails may have been contaminated, Pepsi is precluded from being able to distribute their contents without fear of civil or criminal liability under 21 U.S.C. § 331(a) (prohibiting "[t]he introduction ... into interstate commerce of any food, drug, device, or cosmetic that is adulterated"). Under the circumstances, the conclusion that Appellants have sufficiently shown more than a minimal decline in market value and hence, some damage for purposes of a COGSA prima facie case, is inevitable.[14] *Cf. Int'l*

12. Silver stated: "I know that given the design of those containers that I can't guarantee to the bottler, to my customer, that the material inside those containers had not been contaminated, can't guarantee, then I have no choice but to not use that material." *See* App. 33, Deposition of Lewis Silver (January 31, 2001).

13. At oral argument, Appellees contended that no weight should be given to the bottlers' alleged position because they were at one with Appellant. Appellees did not deny, however, that the bottlers would not accept the concentrate in the condition in which it was delivered.

14. Because Appellees introduced no evidence that the concentrate retained its market value, in contradiction to Appellant's testimony that the cargo had no value after it was immersed in ballast water, we need not decide whether, had such evidence been presented, summary judgment could still have issued, or whether a question of fact as to the diminution of market value would have existed such that summary judgment would have been improper.

In their briefs, the parties discussed at some length the issue of Pepsi's duty to mitigate damages. These considerations are relevant, if at all, only at a later stage. Similarly, the exact *amount* of damage may still be argued, if Appellees, at a later stage, proffer evidence on the issue. But the existence of *some* damage cannot be disputed. And that is all that is needed at this point in the proceedings.

*Barges, Inc. v. Kerr–McGee Corp.*, 579 F.2d 1204, 1209 (10th Cir.1978) (in adjudicating a contract dispute—not governed by COGSA—the Tenth Circuit stressed that "market attitudes had to be faced" and, on those grounds, accepted the plaintiff's assertion that its cargo was unmarketable because a shipper had exposed the cargo to infinitesimal amounts of butylene).

Because Appellees have accepted responsibility for the circumstances that led to the pails being submerged in ballast water for a prolonged period of time, and because these conditions precipitated the loss of the concentrate's market value (and did so regardless of whether actual contamination occurred), we hold that Atlantic Mutual has adequately shown, for the purposes of establishing a prima facie case of liability under COGSA, that the shipment it received in Port Elizabeth was "damaged upon delivery." We therefore conclude that the district court's findings to the contrary were error.

Accordingly, we VACATE the district court's grant of summary judgment in favor of Appellees, and REMAND the case for further proceedings consistent with this opinion.

**OMEGA ENGINEERING, INC.,**
**Plaintiff–Appellee,**

v.

**OMEGA, S.A., Defendant–Appellant.**

**Docket No. 04–5084–CV.**

United States Court of Appeals,
Second Circuit.

Argued May 12, 2005.

Decided Dec. 21, 2005.

438

Matthew C. Wagner, Ossining, New York (Jess M. Collen, Collen IP, Ossining, New York, of counsel), for Defendant–Appellant.

Thomas A. Smart, New York, New York (Paul C. Llewellyn, Michelle Tepper, Kaye

Scholer LLP, New York, New York, of counsel), for Plaintiff–Appellee.

Before: FEINBERG, CARDAMONE, and SACK, Circuit Judges.